# Pennsylvania Optometric Association, Inc.
## v. DiGiovanni

*Samuel M. Lehrer*, for plaintiffs.

*Bellwoar, Rich & Mankas*, for defendant.

LEVIN, P. J., March 15, 1968.—

### STATEMENT OF PLEADINGS AND ISSUES

We have before us an action in equity brought by two licensed and practicing optometrists, in their own behalf and as members of the Pennsylvania Optometric Association, Inc., in which plaintiffs complain that defendant is practicing optometry without a license, contrary to the laws of our Commonwealth. Plaintiffs seek to enjoin this allegedly unlawful conduct of defendant.

By his pleadings, defendant contends that:

1. He has not engaged in the practice of optometry.

2. As an optician he is an "ancillary" to the physician and thereby falls within the exception granted the latter by the statute governing the practice of optometry.

As we have analyzed the pleadings, these contentions of the parties are the issues we are asked to resolve.

### FINDINGS OF FACT

From the pleadings, testimony and admissions during trial, we make the following findings of fact:

1. Plaintiff, John C. Neill, has been licensed to practice optometry in Pennsylvania since 1923. He is a pioneer, teacher, author and practitioner in the field of contact lenses and an eminent and highly qualified specialist and expert therein.

2. Plaintiff, Harry Kaplan, has been licensed to practice optometry in Pennsylvania since 1949. He, too, is a highly regarded and qualified specialist, practitioner, educator and expert in the contact lens area.

3. Plaintiff, Pennsylvania Optometric Association, Inc., is a nonprofit Pennsylvania corporation whose members are all licensed to practice optometry in this State. One purpose of this association, and perhaps its principal function, is the espousal and maintenance of a code of ethics stressing high standards of professionalism among practicing optometrists.

4. Defendant, Francis P. DiGiovanni, is not licensed to practice optometry or medicine in Pennsylvania.

5. Said defendant is an optician whose principal place of business is in Philadelphia.

6. Opticians are not members of a profession but, at best, are artisans or mechanics whose training and skill lie in the grinding, polishing and fabrication of optical lenses in accordance with prescriptions provided by physicians or optometrists.

7. The Commonwealth of Pennsylvania does not require opticians to be licensed in order to pursue their trade.

8. On at least two occasions, defendant, without any prescription whatsoever from a physician or optometrist, provided and adapted contact lenses for a client by obtaining the refractive or corrective powers of the lenses from the spectacles already possessed by such client.

9. Most of the clients for whom defendant fashioned contact lenses came to him with a written prescription containing no specific direction from a physician or optometrist that contact lenses were to be provided.

10. The prescriptions brought to defendant generally contained no information but the refractive or corrective powers of the lenses to be provided, while some included such additional information as a specific directive for contact lenses and, perhaps, the vertex distances[1] of the lenses.

11. In order to provide contact lenses which will fit properly and adequately correct defective vision, it is necessary to obtain the following measurements and specifications:

(a) the refractive powers[2] of the lenses;

(b) the radii of curvature of the optical[3], periph-

[1] The *vertex distance* is the distance from the front surface of the cornea to the back surface of the correcting lens: Grosvenor, Contact Lens Theory and Practice (The Professional Press, Inc., 1963), p. 410.

[2] *Refractive Power* is the ability of a lens to refract light expressed quantitatively, as in a prescription, by the index of refraction of the lens: Webster's Third New International Dictionary (1965).

[3] The *optical zone* of a contact lens is the central zone, corresponding in width to that of the base curve of the lens: Grosvenor, ibid. footnote 1, p. 406.

eral[4] and transitional[5] zones of the lenses;

(c) the diameters of the lenses;

(d) the diameters or cords[6] of the optical zones;

(e) the thickness of the lenses;

(f) the type of edge finish.

12. In providing contact lenses, defendant routinely did the following:

(a) discussed with his client the feasibility of the use of contact lenses;

(b) measured the corneas of the eyes with a keratometer[7] in order to determine the radii of curvature of the optical zones of the corneas;

(c) employed a millimeter scale[8] and/or a set of trial lenses in order to obtain the diameters of the corneas;

(d) inserted and fitted trial lenses into the eyes of the client and, with the aid of a Burton Lamp,[10] judged which lenses afforded the best fit;

(e) had the client wear those trial lenses for about an hour during or after which defendant would elicit

---

[4] The *peripheral zone* is the most outward area on the anterior surface of the lens and is expressed in millimeters of radius of curvature: Girard, Corneal Contact Lenses (C. V. Mosby Co., 1964), p. 31.

[5] The *transitional zone* is the area demarking the boundary between any two zones on the back surface of a corneal contact lens: Grosvenor, ibid. footnote 1, p. 410.

[6] A *cord* (or chord) is a straight line joining two points on a curve: Webster's Seventh New Collegiate Dictionary (1965).

[7] A *keratometer* (or ophthalmometer) is an instrument used for measuring the curvature of the anterior surface of the cornea: Grosvenor, ibid. footnote 1, p. 406.

[8] A *millimeter scale* (or P.D. ruler) is a specialized measuring device broken down into divisions of thousandths of a meter.

[9] *Trial lenses* (or diagnostic lenses) are lenses which are fitted on a patient's eyes in order to determine the lens specifications needed by the patient; diagnostic lens fit may be evaluated by the use of fluorescein and other materials and instruments: Grosvenor, ibid. footnote 1, p. 404.

[10] A *Burton lamp* is a specialized lamp containing a magnifier.

from the client and evaluate any complaints or reactions concerning the lenses;

(f) make such corrections in the lenses as defendant deemed necessary, based upon the information gleaned from his own observations and the complaints and reactions of the client;

(g) often applied fluorescein strips[11] to the client's eyes to determine whether the lenses were resting on a proper tear cushion;

(h) submitted an order to a manufacturer of contact lenses, containing the precise dimensions and specifications of the lenses;

(i) upon receipt of the lenses from the manufacturer, checked them to determine whether they conformed to his order and, by using a lensometer[12] or a vertometer[13], measured their refractive powers to make certain of conformation to the prescription;

(j) inserted the lenses into the client's eyes to ascertain whether they fitted comfortably;

(k) returned the lenses to the manufacturer with requested corrections whenever defendant was of the opinion that such corrections were indicated;

(l) submitted the finished lenses to the client with instructions in the hygienic treatment to be pursued in caring for them and in the technique of inserting them into and removing them from the eyes;

(m) established a schedule of wearing time which the client was advised to follow:

(n) cautioned the client to return to the prescrib-

---

[11] *Fluorescein strips* are material containing a chemical dye which stains the tear fluid when instilled in the eye and causes a fluorescent pattern which can be used to evaluate the fit of a contact lens with the aid of ultra-violet light: Grosvenor, ibid. footnote 1, p. 405.

[12] A *lensometer* is an instrument used for measuring the vertex power of a lens. Grosvenor, ibid. footnote 1, p. 406.

[13] *Vertometer*—same as lensometer.

ing physician or optometrist for an examination of the finished lenses.

13. Defendant is presently providing clients with contact lenses in accordance with the procedure just detailed.

14. In the context used in this proceeding, as well as in common and professional parlance, "contact lenses" are entirely distinct from "spectacles" or "eyeglasses", and the prescription and adaptation of the former present problems and considerations different from those posed by the use of the latter.

15. The proper use of the scientific instruments mentioned above and the intelligent interpretation of the readings obtained therefrom require professional skill, judgment and discretion, and a thorough knowledge of the anatomy, physiology and biophysics of the human eye.

16. If these instruments are employed by one who is not of such professional stature and training, there is a distinct likelihood that improper measurements will be obtained.

17. Further, if a contact lens is not entirely of the proper dimensions, it may cause damage to the eye to which it is adapted, and there is medical evidence that such damage has occurred in such instances.

18. The laws of this Commonwealth regulating the practice of optometry were adopted in pursuance of, and have a direct relationship to, the health and welfare of the general public.

### DISCUSSION

Pennsylvania law defines optometry as follows:
"The practice of optometry is hereby defined to be the employment of *any means or methods*, other than the use of drugs or surgery, *for the examination of the human eye and the analysis of ocular functions, or the prescribing, providing, furnishing, adapting or employing any or all kinds and types of lenses* and prisms,

visual training orthoptics, ocular exercises, and any and all preventive and corrective methods *for the aid, correction or relief of the human eye,* its associated structures, appendages and functions, other than the use of drugs or surgery.

"The term 'optometrist' means a person who practices optometry in accordance with the provisions of this act. 1917, March 30, P. L. 21, §1; 1951, Aug. 17, P. L. 1280, §1": 63 PS §231 (Italics supplied.)

This statute makes it a misdemeanor for anyone to engage in the practice of optometry unless he has been duly licensed by the Commonwealth: 63 PS §232. The act exempts from its operation only physicians or surgeons who are licensed under the applicable laws of Pennsylvania, and persons selling spectacles or eyeglasses but who do not adapt such devices to the eye: 63 PS §240.

Plaintiffs allege that defendant is contravening the above statute in that he has been practicing optometry without a license to do so. More specifically, it is contended that defendant has examined the eyes of some of his clients, and has prescribed, provided, furnished and adapted contact lenses for the use of these clients. Plaintiffs pray that this court enjoin defendant from this behavior.

Initially, defendant took exception to the court's equity jurisdiction in this matter, but he later conceded that we have such jurisdiction over the subject matter and parties involved.

Defendant admits that he is not licensed to practice either optometry, medicine or surgery, but is rather solely an optician by trade. He does not seek to place himself within the exception to the statute that is granted persons who sell spectacles or eyeglasses. Indeed, he could not, because this suit comprehends only the subject of contact lenses, and contact lenses are distinct from spectacles or eyeglasses.

The defense can be divided into two general contentions:

(a) Defendant denies he has been engaged in any behavior, except for two isolated instances, that would amount to the practice of optometry within the meaning of the statute quoted above.

(b) Defendant alleges that qua optician he is an "ancillary" of the medical doctor or physician and, even if he is in some minor way performing acts which constitute the practice of optometry, he is protected by the exception to the act which is granted medical doctors.

Although defendant has conceded our jurisdiction, we consider it appropriate and instructive to make passing reference to this matter. It is a maxim of the law that jurisdiction exists in equity to enjoin the unlicensed practice of a profession, *despite the fact that the criminal law may proscribe such trangressions.* The Supreme Court of this State declared, in the leading case of Boggs v. Werner, 372 Pa. 312, 317 (1953):

". . . there is ample precedent for the chancellor's conclusion that the illegal practice of a profession is a proper subject of equitable jurisdiction. We have sustained the actions of chancellors imposing restraint on illegal practice of: (a) law—Childs v. Smelter, 315 Pa. 9, 171 A. 883, and Shortz v. Farrell, 327 Pa. 81, 193 A. 20; (b) optometry—Neill v. Gimbel Brothers, Inc., 330 Pa. 213, 199 A. 178; and (c) medicine—Palmer v. O'Hara, Secretary of Welfare, 359 Pa. 213, 58 A. 2d 574. In the last case cited, Mr. Justice Jones said for the court at p. 227: 'Equity's jurisdiction under the Act of June 16, 1836, P. L. 784, 17 PS §41, as amended, to restrain the Secretary of Welfare for the Commonwealth from condoning and encouraging the practice of medicine by persons not licensed . . . is neither questioned nor open to question. The juris-

diction is invokable on the complaint of a duly licensed member of the profession unlawfully so invaded: Harris v. State Board of Optometrical Examiners, 287 Pa. 531, 534, 135 A. 237. And, that is so notwithstanding a penal remedy is provided for the redress of the offense . . . ' " (Italics supplied.)

Having disposed of the jurisdictional matter, our attention shall focus on the question of whether any part of defendant's conduct with respect to his clients amounts to the practice of optometry within the meaning of our statute and, if so, whether such conduct should be enjoined. It should be reiterated that this suit involves only the subject matter of contact lenses and in no way concerns itself with spectacles or eyeglasses. Plaintiffs make no complaint as to the latter. Furthermore, it is reasonably obvious from the testimony adduced at trial that the construction and adaptation of contact lenses is far more complicated and presents far greater hazard to the patient than the construction and adaptation of spectacles.

Defendant has been a dispensing optician since 1949, and in this capacity he has fitted and adapted optical lenses according to prescription. Defendant is also currently employed by the Philadelphia Board of Education at the Bok Technical School where he teaches courses in "optical mechanics". He is a high school graduate and has some credits toward a bachelor of science degree.[14]

Several years ago, defendant took a course given by Bausch and Lomb which lasted *two weeks* and during

---

[14] Pennsylvania law requires that an individual possess a high school education and a degree from a certified college of optometry having a minimum course of three years of study before that person can take the licensing examination for optometrists. The examination itself consists of tests in "practical, theoretical, and physiological optics, . . . theoretical and practical optometry, . . . anatomy and physiology of the eye, and . . . pathology as applied to optometry": 63 PS §233.

which he was instructed in the techniques of manufacturing, fitting, altering and adapting contact lenses. This is the only instruction, education and training defendant has ever had in the fashioning of contact lenses. Since taking this brief course, however, he has made the dispensing of contact lenses an integral part of his business.

Defendant admits that on two occasions he fitted and adapted contact lenses without any prescription, written or otherwise, from a physician or optometrist. In both instances, he obtained the refractive (i.e., corrective) powers of the contact lenses by measuring the lenses of the spectacles which the client had in his possession.

Defendant further admits that a large percentage of his contact lens clientele bring "prescriptions" which contain only the refractive or corrective powers of the lenses.

Finally, defendant states that some customers come to him with prescriptions which specifically order contact lenses and that these prescriptions sometimes contain the vertex distances of the lenses as well as their refractive powers.

Defendant maintains that most of his customers are referred to him by ophthalmologists,[15] but he does receive some referrals from optometrists. Once a client

---

[15] It will be useful to give some formal definitions of the terms *opthalmologist*, *optometrist* and *optician*.

An *ophthalmologist* is a medical doctor who specializes in the anatomy, physiology and diseases of the human eye: Gould's Medical Dictionary (4th Ed.).

An *optometrist* is one who is qualified in the profession of examining the eye for defects and faults of refraction and prescribing correctional lenses or exercises but not drugs or surgery: Webster's Seventh New Collegiate Dictionary (1965).

An *optician* is one who grinds spectacle lenses to prescription and dispenses spectacles: Webster's Seventh New Collegiate Dictionary (1965).

does come to him and it is determined that the client has an interest in contact lenses, defendant, it appears, follows a set pattern in his relationship with the customer.

Often, the client will ask whether he is suited to wear contact lenses. Defendant's pat response is that no one can predetermine whether a person can safely and comfortably wear such lenses.

If, after this initial inquiry, the customer still exhibits a desire for contact lenses, defendant proceeds to fit him with such lenses and to adapt them to his eyes. This procedure generally entails the following:

Defendant measures the corneas of the client's eyes with a keratometer and a millimeter scale in order to determine preliminarily some of the dimensions of the lenses to be used.

Next, defendant inserts trial lenses into the eyes of his customer. These are lenses of known measurements and this is a trial-and-error process whereby defendant can gradually ascertain which trial lenses of known dimensions afford the most comfortable fit for the client. During this procedure, defendant examines the customer's eyes with a Burton Lamp in order to see what posture the trial lenses take while resting on the eyes. With the aid of this device, defendant judges whether a particular lens is riding the center of the eye or whether it is slipping or dropping off; whether or not there are air bubbles under the lens which would indicate an improper fit; and whether the diameter of the lens is correct in relation to the cornea.

When defendant believes that he has the lenses with the correct measurements, he instructs the customer to keep those lenses in his eyes for approximately an hour. During this time, the client is observed for signs of discomfort or pain. If the patient does com-

plain, further tests are conducted to ascertain the source of the irritation.

Defendant often applies fluorescein strips to the eyes of the customer, and from the resulting fluorescent pattern determines whether or not the lenses are resting on the proper tear cushion.

After defendant is satisfied that he has the correct measurements, he submits these in an order to a manufacturer for the fabrication of the lenses for the client. When defendant receives the finished lenses, he checks them to determine whether they conform to his own measurements. At this point, defendant also employs a lensometer or vertometer to make certain that the lenses are of the refractive powers specified in the prescription forwarded by the physician or optometrist. Defendant then inserts the lenses into the client's eyes and examines the fit of the lenses in relation thereto. If, in defendant's opinion, any corrections need be made, he returns the lenses to the manufacturer with accompanying instructions and, upon receiving them back, repeats this checking procedure.

When defendant finally possesses the finished lenses, he submits them to the customer, informing him of the hygienic measures to be employed in their use. He also instructs the customer in the technique of inserting the lenses into and removing them from the eyes and sets up a schedule for the client according to which the latter is to wear the lenses a certain amount of time each day so that he may gradually accustom himself to their use.

After all this is done, defendant informs the client that he should return to the prescribing ophthalmologist or optometrist for a check-up. (Apparently the only time defendant contacts the prescribing doctor during defendant's services to the client is when the doctor has specifically instructed defendant to make such contact or when the client experiences problems

which defendant deems require the expertise of the doctor.)

The resolution of the matters before us depends upon the precise legal delineation between the practice of optometry and the trade of optician. That is, defendant is an optician only, and if any of his behavior, as just described, amounts to the practice of optometry, this court has the discretionary power to enjoin such unlawful behavior.

To be certain, optometrists and opticians are engaged in kindred areas of endeavor, but the laws of this Commonwealth have long recognized that a dichotomy exists between the two:

" . . . there has arisen a classification or division, whereby some who make lenses confine themselves entirely to the work of making them in accordance with prescriptions given by physicians or oculists. These call themselves or are known as 'opticians'; others, who still manufacture the lenses . . . do not confine themselves to the making of lenses, but also examine the eyes for the purpose of ascertaining whether there are such defects visible as can be corrected by the application of lenses. This class has taken the name of 'optometrists', and that is the name by which they are now generally known": Martin v. Baldy, 249 Pa. 253 (1915).

"The professional charges of optometrists are for examining the eyes, for prescribing glasses and for examining and fitting glasses after they are made. Prescriptions for glasses formulated by optometrists are filled by the . . . optician": Neill v. Gimbel Brothers, Inc., 330 Pa. 213 (1938).

Thus the distinction that the early cases draw between the optometrist and the optician is that the former is the diagnostician and the one who treats and prescribes for the correction of visual defects, while the latter is solely an artisan, a mechanic schooled in grinding and polishing lenses.

The optometrist, not the optician, is the one who is regarded as the professional with the skill and training necessary to perform the intricate processes involved in the treatment of defective sight. The optometrist is the one who is viewed as possessing the experience and judgment fundamental to the expert care of so delicate an organ as the human eye:

"(The law regarding optometry) requires that everyone fitting himself to practice shall take an examination 'in practical, theoretical, and physiological optics, in theoretical and practical optometry, and in the anatomy and physiology of the eye, and in pathology as applied to optometry'. To enable the user of the mechanical processes to intelligently, understandingly, and scientifically apply them, he must have the background of scientific and technical knowledge and training which is required. His operation of his instruments is no mere rule of thumb . . . ": Neill v. Gimbel Brothers, supra, at 218. See also Rosenthal v. O'Hara, 40 D. & C. 568 (1940), and Neill v. Chaby, 86 D. & C. 457 (1953).

This is the early legal view of the differences between optometry and opticianry and, as we shall demonstrate, this view has not changed.

The present statutory law of Pennsylvania forbids anyone but a licensed optometrist or physician to engage in "the *examination* of the human eye and the *analysis of ocular functions, or* the *prescribing, providing, furnishing, adapting* or *employing any or all kinds* and types of *lenses* . . . for the aid, correction or relief of the human eye . . . ": 63 PS §§231, 232, 240 (Italics supplied.).

Defendant concedes that on two occasions (one of which involved a private investigator engaged by plaintiffs), without any prescription whatsoever therefor, he provided contact lenses for a client, the refractive powers of which he obtained by measuring

the spectacles used by the customer. In effect, and even assuming the accuracy of his measurements, defendant "prescribed" the same plus or minus corrective values for the contact lenses as were in the spectacles. Whether those values were originally correct, or whether the passage of time or the intervention of illness or disease had altered the amount of ocular correction required, appeared to be of no importance to the defendant. There can be no doubt that this particular practice falls within that part of our statute which prohibits the "prescribing" of contact lenses except by optometrists and physicians.

In a recent but unreported Pennsylvania case, a common pleas court sitting en banc upheld the criminal conviction of an optician for practicing optometry without a license. In this case, as in our own, the optician, without any directive from a qualified optometrist or physician, obtained the lens prescriptions of his client by measuring the latter's spectacles. With this information, the optician fashioned contact lenses for the client. The court had this to say concerning defendant's behavior:

" . . . We agree with the trial court *the determination as to whether a person shall wear contact lenses . . . necessitates the prescription . . . of lenses which under the Act of Assembly may lawfully be performed only by one licensed to practice optometry, or by an ophthalmologist*": Commonwealth v. Robert A. Crouse, Court of Quarter Sessions of Northampton County, April sessions, no. 129 (1965), pp. 5-6. (Italics supplied.)

In addition to the two occasions where defendant had no prescription whatsoever, there are many other instances where he "prescribed" the contact lenses that he furnished to his customers. This is a reference to the numerous instances when a customer came to

defendant with a prescription containing only the refractive powers of the lenses but with no specific directive that contact lenses were to be provided. In such instances, when defendant provided contact lenses he was, in essence, prescribing such lenses in the sense that it was he, an optician, and not a licensed, qualified professional, who made the determination to provide contact lenses. That a customer insisted upon or agreed to contact lenses is of as little significance as if such a customer had insisted upon or consented to open heart surgery by a blacksmith or the extraction of a tooth by a plumber.

It is interesting to note that defendant grudgingly admits that he erred when he provided contact lenses sans any prescription at all or according to a prescription which did not specifically indicate such lenses.

At any rate, such practices amount to the unlicensed "prescribing" of contact lenses in contravention of our statute. Furthermore, the expert testimony at trial established to our complete satisfaction that there are recognized clinical contra-indications for contact lenses, i.e., in some instances an individual cannot comfortably and safely wear such lenses; and only a skilled physician or optometrist is capable of determining the existence of these warning signs against the use of contact lenses. This is clearly one reason why the act regulating optometry places the prescribing of lenses within the exclusive realm of licensed physicians and optometrists, and this reasoning is recognized in Crouse, supra, at pp. 3 and 5.

The final group for whom defendant provided his services were those who came to him with prescriptions, including a directive to provide contact lenses. In relation to these clients, while it may not be said that defendant "prescribed" contact lenses for them, as was true in the first two categories, we are firm in concluding that defendant did in other ways abridge

the statute governing the practice of optometry. That is, for this last group of customers, defendant engaged in the "examination" of the eye and the "analysis of ocular functions", and the "providing, furnishing, adapting" and "employing" of "lenses . . . for the . . . correction . . . of the human eye. . . ." We should like to point out that these later charges apply to the first two groups of defendant's clientele as well as to the last group, i.e., they apply to all of defendant's contact lens customers.

It is quite clear from the testimony that when it was decided that a client was to receive contact lenses, whether this decision was made by defendant himself or by a physician or optometrist, defendant would employ scientific instruments to measure the corneas of the client in order to obtain preliminary measurements of the lenses to be used. To refine these measurements and to obtain others, defendant inserted trial lenses of known dimensions into the client's eyes. During this procedure, defendant would elicit from the customer any complaints concerning the fit of the lenses. He also would view the posture of the trial lenses on the eyes of the customer with the aid of a special lamp, and would often apply fluorescein strips to determine the adequacy of the tear layers upon which the lenses rested. Finally, defendant interpolated the information gleaned from his observations and readings, and evaluated whatever complaints the client made. Only after completing this routine was defendant in a position to provide the manufacturer of the lenses with all the specific measurements and specifications required.

In addition, when defendant received the lenses from the maker, he checked them with instruments to certify that they matched his specifications and he applied them to the customer's eyes to ascertain the comfortableness of the fit. He also instructed the cus-

tomer in the hygiene of the lenses and the method of insertion and removal into and from the eye, and outlined a wearing schedule for the use of the client.

There is no doubt that this general procedure entails the "examination of the human eye and the analysis of ocular functions". What else could it possibly be considered when one places lenses into the eyes and observes with the aid of special devices and chemicals how those lenses adapt to the contours of the eyes? Whether there is friction and resulting abrasion? Or whether tell-tale air bubbles can be found under the lenses? What else but the examination of the eye and the analysis of its functions is occurring when an optician asks his customer whether lenses are irritating the eyes?

We do not stop here, however, because this routine procedure of defendant beyond a doubt also entailed the "providing, furnishing, adapting" and "employing" of contact lenses for the purpose of correcting defective vision and, because defendant is neither a licensed optometrist nor a licensed physician, this behavior is clearly violative of our statute.

Defendant would have us believe that the employment of the keratometer, the millimeter scale, the Burton Lamp, fluorescein strips and the insertion of trial lenses into the eye are simple, purely mechanical procedures. He asserts that an optician, of whom no license is required and who has undergone no comprehensive education and training in the physics and physiology of the eye or the delicate technique of fitting and adapting a contact lens to that organ, is completely capable of performing these tasks and of employing all the critical judgment and skill that are essential in arriving at a safe, satisfactory product for the customer.

We must reject these propositions. We are well persuaded by the expert testimony produced by plain-

tiffs that the exact measurements of a contact lens are crucial in the determination of whether the lens will fit properly and adequately correct the vision. It was convincingly related that an improper fit can result in damage to the eye, perhaps very severe damage. Plaintiffs made manifest that the procedures involved in determining the precise dimensions of a contact lens are complicated rather than simple; that the correct application of the scientific measuring instruments used requires thorough, formal training; that the insertion and removal of trial lenses into and from the eyes is a delicate process which, if done inexpertly, could cause distress and harm to the client. It was also persuasively disclosed that the interpretation of the client's complaints, the instruction of the correct method of insertion and removal of a lens, and the planning of a wearing schedule are matters which necessitate a high degree of professional skill, judgment and experience.

These are the opinions which this court, after consideration of the entire record, chooses to adopt.

Parenthetically, one of defendant's witnesses, an esteemed ophthalmologist, Dr. Philip G. Spaeth, testified that the improper fitting and adapting of contact lenses could produce injury to the client. Dr. Spaeth also imparted that he always attempts to refer his contact lens patients to opticians with whose skill and experience the doctor is personally acquainted.

Another renowned ophthalmologist who testified on defendant's behalf, Dr. Bernard Gettes, recognized that an unskilled optician could cause harm to the individual during the contact lens fitting process. Dr. Gettes tried to minimize the possible damage that could be done, but he also stated that he takes care to refer his contact lens patients only to skilled, experienced opticians.

(It is interesting to note that neither ophthalmogist testified to the specific skill or capability of defendant in fitting and adapting contact lenses. Indeed, Dr. Spaeth stated that he did not know defendant personally or professionally, and Dr. Gettes indicated the same.)

Defendant argues that even if he might cause some harm to a contact lens customer, such harm would be remedied, since he always cautions his clients to return to their prescribing doctors. This contention is fallacious on two grounds: First, it is clear from the testimony that not all patients do return to the ophthalmologist after they are discharged by the optician; second, the optician normally works with the client for a prolonged period and, during this crucial time, injuries may occur which reach a very aggravated stage by the time the client returns to the ophthalmologist.

Defendant relies heavily upon Commonwealth v. Stemet, 21 D. & C. 2d 295 (1959), and asserts that this case stands for the proposition that the act governing the practice of optometry was not intended to regulate the behavior of the optician insofar as he dispenses lenses according to prescription.

We cannot accept this argument. The Stemet court was faced with the narrow question of whether the use of a keratometer to measure the curvature of the eye amounts to the practice of optometry. In the instant case, however, we are faced with a far more comprehensive set of facts. In addition, this is not a criminal case as was Stemet and, therefore, does not entail the degree of proof required in such a lawsuit. Moreover, we do not believe, as the court in Stemet appeared to, that the act in question confines itself to the "examination" of the eye to determine the existence of visual defects. Indeed, the wording of the statute plainly goes beyond examination and extends

to the "prescribing, providing, furnishing, adapting or employing any or all kinds . . . of lenses" to correct vision.

Except for Stemet, which we believe is readily distinguishable from the case at bar, the weight of authority in Pennsylvania, as discussed above, appears to be in complete harmony with our view of the law.

There is also substantial authority in other jurisdictions which soundly supports our position. In a case very similar to ours, the Oregon Supreme Court, applying a statute[16] less obvious in its restriction of opticians than ours, had this to say:

"It seems *shocking* to relate that much the highest percentage of prescriptions for contact lenses received by defendant [optician] left to him the major responsibility of making the initial tests to determine size as well as the actual fitting of the lenses . . .

"Above all, however, it is clear from the evidence without any reasonable doubt, that the fitting of the lenses required some degree of professional skill and judgment:" State ex rel. Reed v. Kuzirian, 228 Or. 619, 365 P. 2d 1046 (1961) (Italics supplied.)

In another suit very similar in fact to the instant one, the Superior Court of New Jersey, Appellate Division, stated the following in upholding a criminal conviction:

"[It is clear] that the fitting of contact lenses is within the professional scope of the optometrists but is an activity proscribed to the artisan trade of an optician or ophthalmic dispenser. *Defendant's conduct in examining [the client's] eyes with the aid of [scientific instruments], his amplification and supplementation of the ophthalmologist's prescription, the application of fluorescein directly to the eyeballs, and the*

---

16 "[Optometry is the] employment of any means other than the use of drugs for . . . *the adaptation of lenses* . . . for the aid [of the human eye]": ORS 683, 190 (Italics supplied.)

*prescribing of a wearing schedule constituted the practice of optometry without a license. In violation of the letter and spirit of the law, [defendant optician] adapted lenses to aid the vision . . .*

*"There is a self-evident distinction between the mechanics of making conventional eyeglasses and their adjustment to the face, and the fabrication of contact lenses and the fitting of them directly to the eyes. The latter, unlike the former, involve a direct exposure to possible eye injury and require professional skill and judgment. The character, intensity, and severity of ocular damage resulting from the improper fitting of contact lenses has general recognition.* See Schwartz, 'Some Observations on Contact Lens Fitting by Technicians,' 24 Pennsylvania Optometrist 11 (Jan.-Feb. 1964) . . . 'The Contact Lens Gap— Delegation or Default?' 65 Archives of Ophthalmology 161 (1961). *This matter is of grave concern to the public and demands the enforcement of protective legislation.*

*"It is no defense that [defendant optician] processed a doctor's prescription and that his work had been pronounced satisfactory by the ophthalmologist after a wearing time of three weeks. The crucial period requiring professional supervision was at the time of the adaptation of the lenses, their initial adjustments and the early stages of wearing . . .":* New Jersey State Board of Optometrists v. Reiss, 83 N.J. Super. 47, 57-58, 198 A. 2d 816, 821-822 (1964) (Italics supplied.)

There is also an opinion by the District of Columbia Court of Appeals, dealing with a fact situation reminiscent of our own and a statute[17] less comprehensive in its wording than the Pennsylvania act regulating

---

[17] "[Optometry is defined as] . . . the *adaptation of lenses* for the aid and relief [of visual defects]": D. C. Code 1961, sec. 2-502 (Italics supplied.)

optometry. In this case, the District of Columbia court, in upholding the conviction of the defendant optician, had this to say:

"*. . . Without repeating the entire procedure by which appellant fitted the patient's lenses, it is clear that this involved areas of judgment and skill necessary to the adaptation of lenses within the meaning of our optometry statute. This was much more than the technical preparation or sale of a pair of spectacles or eyeglasses . . .*

"*In each of the steps by which the contact lenses were fitted, expertness and training were essential. The consequences of improper fitting, instructing, and follow-up observation are well documented. They include actual curvature changes of the cornea, painful abrasions and ulcerations of the cornea, infections, blindness and surgical removal of the eye. The fitting of a contact lens is the introduction of a foreign body in immediate contact with a sensitive part of the body, the cornea, which can result in serious injury.* This was a consequence which well might have flowed from appellant's unsupervised fitting. Without belaboring the point, *we feel that the actual fitting of contact lenses is the adaptation of lenses within the meaning of our optometry statute . . .*": Fields v. District of Columbia, 232 A. 2d 300 (1967). (Italics supplied.)

In complete agreement with the foregoing opinions are Kelley, Michigan Board of Examiners in Optometry v. Peterson, 4 Mich. App. 612, 145 N.W. 2d 386 (1966), and the unreported case of C. D. Melton, Jr. v. W. C. Ezell, Constituting The South Carolina Board of Examiners in Optometry, Court of Common Pleas of Richland County, State of South Carolina (Jan., 1967).

Defendant cites High v. Ridgeway's Opticians, 258 N.C. 626, 129 S.E. 2d 301 (1963). There, the North

Carolina Supreme Court held that that State's statutes allowed opticians to fit contact lenses when prescribed by a duly licensed eye doctor. Defendant neglects to mention, however, that the Ridgeway's opinion carefully points out that the North Carolina law requires opticians to be licensed by the State, and a license is granted only if the applicant passes an examination in various fields of the skills of opticianry as well as the practical anatomy of the eye. The Ridgeway's opinion also acknowledges that North Carolina legislation specifically permits an optician, when duly licensed, to "measure, adapt, fit" and "adjust" lenses. See Ridgeway's, supra, pp. 628 and 631.

This is not the existing state of affairs in this Commonwealth. There is no Pennsylvania law requiring opticians to be licensed. Here, if one wishes to be an optician, he need merely begin calling himself one. Furthermore, nowhere in Pennsylvania law can a provision be found which says that an optician may fit, adapt or adjust contact lenses. Indeed, a fair reading of the Pennsylvania act regulating optometry indicates exactly the opposite.

Defendant also stresses the case of State Board of Optometry v. Chester, 251 Miss. 250, 169 So. 2d 468 (1964). In this suit, however, the court enjoined an optician from fitting contact lenses without a prescription. It was only by way of dictum that the court intimated it might allow such behavior if the optician acted under prescription. We fail to see, therefore, how this case supports defendant's position.

Our discussion of the instant facts and the analysis of the applicable statute, precedent and authority make it obvious that defendant herein did, in violation of the laws of Pennsylvania, examine the human eye, analyze ocular functions, and prescribe, provide, furnish, adapt and employ contact lenses in order to correct defective vision.

Defendant's final argument is that, despite the fact he may be practicing optometry within the meaning of our laws, he should not be enjoined therefrom because he acts as a subordinate to the ophthalmologist (a medical doctor) and should, therefore, be protected by the exemption which the law allows physicians and surgeons.

There is no question that this court may regulate the behavior of the optician in his relationship with the ophthalmologist if that behavior is in any way violative of our laws. This was clearly recognized in Chaby, supra, at page 467. See also Reiss, supra, at page 822.

We do not doubt that in some instances the optician, and particularly defendant, acts in a capacity ancillary to the ophthalmologist, but this does not give the former the power to show complete disregard for the will of our legislature as expressed in the statute regulating the practice of optometry.

Defendant makes reference to various instances where a physician delegates some of his duties to aides who are not licensed medical doctors. In the first place, many of these subordinates, although they are not physicians, are licensed to perform the acts which are delegated to them; the nurse is such an example. Secondly, we are not here concerned with the medical licensing act or any other such law. We are confronted solely with the act regulating the practice of optometry, the clear wording of which prohibits the optician from performing the functions which defendant has performed.

There is no doubt that there are opticians who have praiseworthy knowledge and skill in the contact lens field. Mr. Louis Hyman, who testified for defendant, is widely recognized by ophthalmologists as such an optician. Nevertheless, the clear and precise language of the act cannot be construed to distinguish between the most expert and the least expert optician, and

neither ophthalmologist nor optometrist has the legal right to delegate to any unlicensed person any part of the practice of optometry as defined by law.[18]

Perhaps an analogy to the field of law will make clearer the court's position. It is feasible that an individual, under the instruction of a skilled attorney, or perhaps even on his own, might gain an appreciable knowledge of the substance and procedure of the law. However, such a person would have no right to represent parties in legal matters or to draft legal documents. The laws of our Commonwealth dictate that the role of attorney shall be filled exclusively by persons who prove their qualifications by meeting specified minimum standards of formal education and by passing licensing examination. The optometry statute dictates the same procedure in that field, i.e., only duly licensed optometrists, and exempted medical doctors, may practice optometry.

We are, therefore, of the opinion that defendant must be enjoined from the acts complained of and discussed above. The only remaining consideration is the precise form of the injunction.

During the course of the trial, it was intimated several times that defendant should, at the minimum, be allowed to continue in the fitting and adapting of contact lenses when he does so under the direct personal supervision of an ophthalmologist. This was, in fact, the result reached by the Oregon Supreme Court in Kuzirian, supra. We have given this sugges-

---

[18] The most salutary solution to the whole problem would no doubt be the requirement by our legislature of a licensing procedure for opticians. This is the situation in several of our sister States, e.g., New Jersey and North Carolina. Such a law would allow the optician to serve in a subordinate capacity to the ophthalmologist or optometrist whenever the optician is so needed. It would insure, however, that any optician performing the delicate tasks of fitting and adapting contact lenses would possess the basic knowledge, experience, skill and judgment requisite thereto.

tion serious consideration but we cannot subscribe to it. It is clear from all that we have said that the legislature, in its wisdom, has plainly proscribed anyone but optometrists and medical doctors from engaging in the examination of the eye, the analysis of ocular functions, and the prescribing, providing, furnishing, adapting or employing of any lenses for the aid of defective vision. The pronouncement by the legislature was dictated by the highest reasons, the health and welfare of our populace, as emphasized in the preamble of our statute:

*"Whereas, the eyesight of the citizens of this Commonwealth is endangered by incompetent persons practicing optometry, and due regard for the safety and protection of the citizens demands that only authorized and qualified optometrists shall be permitted to practice optometry"* (Italics supplied.)

We do not feel that we can indulge in a judicial amendment to this legislative enactment. Anything but a complete injunction forbidding all of defendant's unlawful behavior would be such an indulgence and an affront to the clear intent of our legislature.

### CONCLUSIONS OF LAW

1. Licensed optometrists are vested with a property right to practice optometry which equity will protect by injunction.

2. Plaintiffs have legal standing to bring this suit against defendant.

3. This court has jurisdiction in equity over the unlicensed practice of a profession.

4. This court has jurisdiction in equity over the parties and subject matter involved herein.

5. Optometry is a profession, the practice of which in Pennsylvania is regulated by the Act of March 30, 1917, P. L. 21, 63 PS §231-244, as amended.

6. Opticians are not members of a profession but are artisans who are schooled in the grinding and

polishing of optical lenses and who need no license to practice their trade.

7. The legislative intent in enacting the statute governing the practice of optometry was to protect the public from harm that might ensue if unlicensed, unskilled persons offered their services in the area of optometry.

8. Defendant, as detailed in the findings of fact and examined in the discussion, committed acts which amount to the unlicensed practice of optometry; to wit, defendant unlawfully:

(a) examined the human eye and analyzed its ocular functions;

(b) prescribed contact lenses; and

(c) provided, furnished, adapted and employed these lenses, all of which was done by defendant to aid and correct the vision of his customers.

9. Defendant does not come within the provisions of the law which grant exemption to certain parties from the operation of the act regulating the practice of optometry.

10. Although defendant sometimes works in a capacity ancillary to the ophthalmologist, he is not entitled to the protection of the exemption granted physicians and surgeons.

11. Contact lenses are entirely distinct from spectacles or eyeglasses, and the prescription, provision, fitting and adaptation of the former present problems different from and more complicated than the latter.

12. The proper use of instruments such as the keratometer, the millimeter scale, trial contact lenses, the Burton Lamp, fluorescein strips and the lensometer, and the intelligent interpretation and application of information gleaned from the employment thereof, require professional skill, judgment and discretion, and a thorough knowledge of the anatomy, physiology and biophysics of the human eye.

13. If a contact lens is not of the proper dimensions and details for the eye for which it is provided, or if it is improperly inserted or removed, there is a distinct possibility that physical damage may result to the eye.

14. Plaintiffs have no remedy at law as full, complete, and adequate as that in equity, and this court of equity should, therefore, exercise its jurisdiction.

15. The acts complained of by plaintiffs should be perpetually enjoined.

16. A decree nisi in the following terms should be entered.

## DECREE NISI

And now, to wit, March 15, 1968, it is decreed that defendant be enjoined from engaging in any manner in the examination of the human eye and the analysis of ocular functions, or the prescribing, providing, furnishing, adapting or employing of contact lenses for the purpose of aiding or correcting the vision of any other person whatsoever. The proscribed behavior shall more specifically include, but shall not be limited to:

A. Providing contact lenses without a specific prescription therefor from a licensed medical doctor or optometrist;

B. Measuring the lenses of spectacles or eyeglasses to obtain the lens prescriptions for contact lenses;

C. Employing a keratometer, a millimeter scale, trial lenses, a Burton Lamp, fluorescein strips or any other similar instruments or materials, to obtain the measurements and specifications of contact lenses;

D. Inserting into or removing from the eye trial lenses or finished contact lenses;

E. Instructing persons in the technique of insertion and removal of contact lenses and the proper hygienic care of such lenses; and

F. Establishing wearing schedules for contact lens patients.