83 N.J. Super. 47 (1964)
198 A.2d 816
NEW JERSEY STATE BOARD OF OPTOMETRISTS, PLAINTIFF-RESPONDENT,
v.
JOHN REISS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 4, 1963.
Decided March 20, 1964.
*49 Before Judges GAULKIN, FOLEY and LEWIS.
Mr. Robert P. McDonough argued the cause for appellant (Messrs. Lindabury, McCormick & Estabrook, attorneys).
Mr. Joseph A. Hoffman, Deputy Attorney General, argued the cause for respondent (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
Mr. William K. Miller argued the cause on behalf of the New Jersey Optometric Association, as amicus curiae.
The opinion of the court was delivered by LEWIS, J.A.D.
Defendant John Reiss, a licensed optician of this State, appeals from a conviction in the Morris County District Court for practicing optometry without a license. He contends that the acts he performed, involving the alleged fitting of contact lenses for a customer, did not constitute the practice of optometry as defined by law.
The facts are uncomplicated and, in the main, undisputed. The legal issues involve jurisdictional questions which require statutory interpretation. The New Jersey Optometric Association, upon consent of the parties litigant and with leave of this court, appeared as amicus curiae.

THE FACTS
On July 19, 1962 Eilene Littig, an investigator for the Division of Professional Boards of the State of New Jersey, visited defendant's office in Morristown for the announced purpose of obtaining contact lenses. She was advised that a prescription would be necessary and was referred to Dr. Edward V. Saradarian, an ophthalmologist. That same day she consulted the doctor who, after obtaining a pertinent medical history, made examinations and performed tests. Dr. Saradarian testified that after he had determined that the patient *50 could wear contact lenses, he gave her a prescription and told her that Mr. Reiss would get the lenses and teach her how to use them. She was to return to him after she had eight hours' wearing time but "sooner if Mr. Reiss deemed it advisable." Under cross-examination the doctor admitted that contact lenses could not be fabricated on the basis of his prescription without additional measurements.
The following day Littig revisited the optician's office. Her eyes were then measured by him with a device known as a keratometer. He also used a "P.D. ruler," graduated in millimeters, to ascertain the size of the cornea and the aperture of the eyelids. The customer was informed that it would take about a week for the lenses to be fabricated and that the cost would be $150 which included "all the fitting that he was to do, plus two visits to Dr. Saradarian, one after a wearing period of, approximately, eight hours, and the other one after a wearing period of fourteen hours."
At the time of her next appointment, August 1, Reiss had procured the lenses. He demonstrated their application and the function of the eyelids in effecting proper placement, retention and removal. She testified that, when she evidenced difficulty in following his instructions, the lenses were inserted by the defendant, and, when she complained about sensations of irritation, tearing and scratching, he examined her eyes with a "pencil light," identified as a transilluminator. Before leaving, she was given a two weeks' wearing schedule with the advice "if anything was bothering me, that I should call him up and come in at the end of the week, and he'd fix it."
On the occasions of her subsequent visits (August 15, 22 and September 8) Reiss employed substantially the same checkup procedure. He inquired as to the condition of her eyes, whether they were scratchy, blurry or foggy, and he utilized, for the purpose of ascertaining "how the lenses were riding," something that looked like a band-aid and, after placing thereon a fluid (vegetable dye known as fluorescein), he touched the wetted portion to her eyeballs causing them to become orange in color. Defendant then examined the *51 eyes with a slit lamp, sometimes called a biomicroscope. He told her that the lack of tearing was a possible cause of the discomfort about which she complained.
On August 24 Littig made her first and only return to the office of Dr. Saradarian, at which time he again tested her vision. The doctor determined that the prescription previously rendered by him had been properly filled, and the patient was given a different wearing schedule.
The defendant gave evidence that he had been engaged in the optician's trade for 15 years and had conducted his business under the incorporated name of J.C. Reiss Company. The keratometer was used in his work to obtain mechanical readings essential for the measurement of the radial curvature of the corneal surface. When interrogated concerning the use of fluorescein, he explained that a "fluora strip" was applied to the eyes "to color the tears, so that you can see the lens more clearly." The original wearing timetable given by him to Littig was characterized as a "routine" schedule suggested in a course he took at "Baylor University College of Medicine on contact lens technician work * * * It was a two-week course, nine hours a day, six days a week." The substance of his explanatory testimony may be summarized thusly: Littig produced a prescription for contact lenses which she obtained from a doctor of ophthalmology; as an optician he merely calculated measurements to determine the size of the lenses, which had nothing to do with the pathology of the eyes or the testing of the powers of vision; the process of checking the "riding" of the lenses on the tear film was to make certain "that he ordered the proper size"; the prescribed wearing schedule was routine; and he directed that the customer return to the ophthalmologist for a determination whether the prescription had been properly filled.

THE EXPERT TESTIMONY
Dr. Harold Zimmerman, a licensed optometrist in this State since 1930, testified on behalf of the plaintiff. He *52 expressed the opinion that a keratometer, also known as an ophthalmometer, is a necessary instrument for the adapting of contact lenses, and that a biomicroscope is generally used to ascertain the relationship and integrity of the eyes after the lenses have been inserted or fitted. In his opinion the employment of such instruments generally requires "a type of professional judgment." The witness stated the prescription issued by Dr. Saradarian was the same as one for ophthalmic lenses "to be worn in frames," and that a pair of contact lenses could not have been made for, or adapted to, the eyes of Littig from the information it revealed. He further opined that the prescribing of a wearing schedule requires the judgment of an adapter with a professional background.
Dr. Blaire D. Sulouff, who had specialized in ophthalmology since 1936, was called as a witness for the defendant. The expert referred to Dr. Saradarian's prescription as an order to the optician to process contact lenses predicated upon designated refractive powers. He testified that the aid of a keratometer would be required to ascertain the radius of the curvature of the cornea, but that such a device, although it may be used for the measurement of refractions, would "tell you nothing about the vision." He voiced the opinion that the use of a slit lamp in checking how a "lens was riding" is not a procedure for the testing of vision. The doctor also described the tear film of the eye as being "frightfully thin" and explained that the application of fluorescein was to facilitate the production of a pattern to see how a lens is "floating, how it's sitting." Defendant offered to produce another specialist in ophthalmology, and it was stipulated that the offer of proof be accepted to the extent that the testimony of the proposed witness would be substantially the same as that proffered by Dr. Sulouff.

THE LEGAL ISSUES
Plaintiff's action against Reiss was instituted to enforce a statutory penalty of $200 (N.J.S.A. 45:12-20) for the *53 practicing of optometry within the meaning of N.J.S.A. 45:12-1 et seq. and, in particular, the violation of N.J.S.A. 45:12-19 which forbids such a practice without an appropriate license.
Our Legislature has declared that optometry is a profession and has formulated definitions declaring, inter alia, that:
"A person shall be deemed to be practicing optometry within the meaning of this chapter * * * who shall employ any means for the measurement of the powers of vision or the adaptation of lenses or prisms for the aid thereof, * * * or to use testing appliances for the purposes of measurement of the powers of vision or diagnose any ocular deficiency or deformity, visual or muscular anomaly of the human eye * * *." (N.J.S.A. 45:12-1; emphasis supplied)
In Abelsons, Inc. v. N.J. State Board of Optometrists, 5 N.J. 412, 418 (1950), Justice Heher, speaking for our Supreme Court in sustaining the constitutionality of regulatory enactments, pointed out that optometry is not a mere trade or craft; rather, it is "an applied branch of the science of physiological optics, directed to the improvement of visual acuity through the correction of refractive errors." Thus, the practice of optometry is subject to regulation for the protection of the public against ignorance, incapacity, deception and fraud, "equally with the practice of ophthalmology and the other `learned professions.'" Id., at p. 419.
This court, in construing the foregoing legislation, has recognized its salutary objectives to protect and preserve the delicate organs of vision and has declared that the proper judicial approach should not be technical but rather realistic and human. We have held, "[t]here should be no disposition to adopt a narrow and constricted view as to what activities are comprised within the practice of optometry as it is delineated in the statute." N.J. State Bd. of Optometrists v. Koenigsberg, 33 N.J. Super. 387, 392 (App. Div. 1954). See also the opinion of the Attorney General of New Jersey, F.O. 1961, No. 8; and note authorities assembled in Annotation, "What constitutes practice of `optometry,'" 88 A.L.R.2d 1290 (1963).
*54 Moreover, it should be noted that defendant is an ophthalmic technician, described in N.J.S.A. 52:17B-41.5 as "One having a knowledge of optics and skilled in the technique of producing and reproducing ophthalmic lenses and kindred products, and mounting same to supporting materials." His license to pursue the business of an optician emanates from N.J.S.A. 52:17B-41.1, which contains unambiguous prohibitory language:
"A person registered under the provisions of this act is specifically prohibited from engaging in the practice of ocular refraction, orthoptics, visual training, or fitting contact lenses; or the prescribing of subnormal vision aids or telescopic spectacles, in his own behalf or as an employee or student of another, whether under the personal supervision of his employer or preceptor or not." (L. 1952, c. 336, p. 1076, § 1; emphasis supplied)
While Reiss is not charged with a violation of the act under which he was licensed, it is essential that we give unity to our revelant statutory laws and "connect them in a symmetrical system." State v. Brown, 22 N.J. 405, 415 (1956), which approvingly cited Modern Industrial Bank v. Taub, 134 N.J.L. 260 (E. & A. 1946), wherein it was observed that "[s]tatutes in pari materia are construed as one act, and the whole harmonized, if possible; and statutes upon cognate subjects may be considered in arriving at the legislative intention, though not strictly in pari materia." Id., at p. 263.
The over-all intention of the Legislature is the controlling factor in the interpretation of its enactments. 2 Sutherland Statutory Construction (3d ed., Horack, 1943), § 5201. While penal and criminal statutes are to be strictly read to avoid penalties by construction, the history of the legislation and other statutes in pari materia may weigh heavily upon the issue of the meaning to be given such legislation. State v. Brown, supra, 22 N.J., at p. 415. See also Palmer v. Kingsley, 27 N.J. 425, 429 (1958), and see generally 3 Sutherland, op. cit., § 5608, p. 65.
Defendant denies that he engaged in the "adaption of lenses" for the aid of vision, or in "fitting contact lenses." *55 He maintains that Littig's eyes were not examined by him in any physiological or diagnostic respect, and that he made no attempt to measure or ascertain the powers or range of her vision. It is argued that his function in the total procedure was that of a dispensing technician, which was no more violative of the optometry laws than was the judicially uncensored transaction in N.J. State Board of Optometrists v. S.S. Kresge Co., 113 N.J.L. 287 (Sup. Ct. 1934), modified by 115 N.J.L. 495 (E. & A. 1935). We find no supportive analogy in that case, which was concerned with the retail merchandising of spectacles, eyeglasses and lenses. There, no evidence savored of an examination of the human eye by objective or subjective means, and the court specifically observed that the customer refused "all assistance, even in choosing a glass * * *." (115 N.J.L., at p. 496.) Furthermore, the Kresge decision was decided many years before the advent of any popular demand for contact lenses and prior to the adoption of our afore-mentioned act for the licensing of opticians.
The decisional law of foreign jurisdictions, in dealing with the permissive activities of optometrists and opticians in the field of contact lenses, furnishes contrasting views depending generally upon differing statutory provisions.
On the narrow question of an optician's measuring the curvature of the eye in order to grind contact lenses, a Pennsylvania court, in a criminal proceeding charging the practicing of optometry without a license, expressed reasonable doubt as to whether such a process came within the category of a professional function. Having such doubt, the defendant was held to be not guilty of the misdemeanor charged. Commonwealth v. Stemet, 21 Pa. Dist. & Co. R.2d 295 (Q. Sess. 1959).
A contra view was enunciated by the Supreme Court of Oregon in State ex rel. Reed v. Kuzirian, 228 Or. 619, 365 P.2d 1046, 88 A.L.R.2d 1283 (1961), which sustained the findings of the trial tribunal that "[t]he insertion, fitting and adjusting of contact lenses involves the introduction of foreign *56 material into a most delicate orifice of the body and is a process which concerns the health and welfare of the public and requires the exercise of professional skill and judgment." The dispensing optician in that case was enjoined from measuring portions of a cornea of any person whatsoever except when it was done under the strict supervision of legally qualified personnel. Accord, Ketring v. Sturges, 372 S.W.2d 104 (Mo. Sup. Ct. 1963), where it was said, in short, that the taking of impressions or measurements of eyeballs for contact lenses and their insertion and adjustments are not "purely mechanical" functions. They require the exercise of judgment. In a Delaware decision, involving another point, it was assumed that the fitting of contact lenses was an act of optometry. Delaware Optometric Corporation v. Sherwood, 36 Del. Ch. 223, 128 A.2d 812 (Sup. Ct. 1957). Note also a New York case affirming a decision of the State Department of Education, In re Petition of Yerdon v. Allen, 16 A.D.2d 992 (App. Div. 1962), now pending before the Court of Appeals of that state (motion for stay granted 12 N.Y.2d 758, 186 N.E.2d 562, 234 N.Y.S.2d 713 (Ct. App. 1962)).
Appellant relies heavily on High v. Ridgeway's Opticians, 258 N.C. 626, 631, 129 S.E.2d 301, 305 (Sup. Ct. 1963), which stands for the proposition that
"* * * so long as the dispensing optician fabricates, fits and inserts contact lenses in the eyes in accordance with the prescriptions of examining physicians or oculists, and requires the patient to return to the examining physician or oculist in order that the writer of the prescription may determine whether or not the prescription has been properly filled and the contact lenses properly measured, fabricated and fitted, such optician is not engaged in the practice of optometry within the meaning of the statute."
An examination of the court's decision will reveal that there the optician apparently did less than defendant did here. In any event, there was an absence in the North Carolina statute of any provision limiting the right of opticians to fit contact lenses to the human eye, and the court held that the general terms of the legislation then prevailing in that state were *57 broad enough to authorize an optician "to do so upon a prescription from a physician, oculist or optometrist."

CONCLUSION
The plain wording and unified sense of our statutory laws make it palpably clear that the fitting of contact lenses is within the professional scope of the optometrists but is an activity proscribed to the artisan trade of an optician or ophthalmic dispenser. Defendant's conduct in examining Littig's eyes with the aid of medical-optometric equipment such as a keratometer, transilluminator and biomicroscope (although not used for the purpose of testing vision), his amplification and supplementation of the ophthalmologist's prescription, the application of fluorescein directly to the eyeballs, and the prescribing of a wearing schedule constituted the practice of optometry without a license. In violation of the letter and spirit of the law, Reiss adapted lenses to aid the vision and was engaged in the business of fitting contact lenses.
There is a self-evident distinction between the mechanics of making conventional eyeglasses and their adjustment to the face, and the fabrication of contact lenses and the fitting of them directly to the eyes. The latter, unlike the former, involve a direct exposure to possible eye injury and require professional skill and judgment. The character, intensity and severity of ocular damage resulting from the improper fitting of contact lenses has general recognition. See Schwartz, "Some Observations on Contact Lens Fitting by Technicians," 24 Pennsylvania Optometrist 11 (Jan.-Feb. 1964); Edwards, "Complications of Corneal Contact Lenses," 30 Insurance Counsel Journal 456 (July 1963); Editorial, "The Contact Lens Gap  Delegation or Default?" 65 Archives of Ophthalmology 161 (1961). The matter is of grave concern to the public and demands the enforcement of protective legislation.
It is no defense that Reiss processed a doctor's prescription and that his work had been pronounced satisfactory by *58 the ophthalmologist after a wearing time of three weeks. The crucial period requiring professional supervision was at the time of the adaptation of the lenses, their initial adjustments and the early stages of wearing. It is noteworthy that Dr. Saradarian testified:
"The first eight hours' wearing time  that is, the time from the initial insertion of the contact lens into the eye to the eight-hour wearing time  is really the most difficult time for the patient. This is the time when they are going to experience the most subjective symptoms due to the fact that a piece of plastic, a foreign object, is being inserted into the eye, an organ which was not devised to accept something by the Almighty."
The trial court's findings of fact and conclusions of law were adequate within the intendment of R.R. 4:53-1 and R.R. 7:16-3 and sufficiently conformed with the three-fold purpose of the rules as noted in Testut v. Testut, 32 N.J. Super. 95, 100 (App. Div. 1954). See also State v. LaPierre, 39 N.J. 156, 166 (1963).
Defendant's conviction is amply supported by the record.
Judgment affirmed.