**STATE of Missouri ex inf. John C. DAN-FORTH, Attorney General of the State of Missouri, et al., Appellants-Respondents,**

v.

**DALE CURTEMAN, INC., a Corporation, and Dale Curteman, Respondents, Appellants-Respondents,**

v.

**MISSOURI STATE MEDICAL ASSOCIA-TION, a Corporation, Defendant on Counterclaim, Appellant-Respondent.**

No. 55391.

Supreme Court of Missouri, Division No. 2.

May 8, 1972.

Motions for Rehearing or to Transfer to Court En Banc Denied June 12, 1972.

849

John C. Danforth, Atty. Gen., Wayne H. Hoecker, Asst. Atty. Gen., Jefferson City, for State of Missouri.

Albert E. Schoenbeck, St. Louis, for relators.

William H. Sanders, David C. Trowbridge, Kansas City, for appellant-respondents, Dale Curteman, Inc. and Dale Curteman.

Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, of counsel.

Bradley, Noble & Baker, John W. Noble, Charles H. Baker, Kennett, for defendant, Missouri State Medical Association.

HOUSER, Commissioner.

The State, on information of the Attorney General, at the relation of the members of the State Board of Optometry, filed a quo warranto proceeding against Dale Curteman, Inc., a corporation, and Dale Curteman, individually, seeking the forfeiture of the corporate charter and an injunction forbidding both respondents and their employees from engaging in certain practices alleged to constitute the illegal practice of optometry without a certificate of registration as a registered optometrist issued by the state board of optometry, in violation of § 336.020 of Chapter 336 of the Missouri statutes relating to optometry. Respondents answered, conceding that they were not licensed as optometrists but denying that they were engaged in illegal activities, claiming that they were working as lay technicians assisting licensed medical doctors specializing in the field of ophthalmology, and that their activities are authorized under § 336.120(2), V.A.M.S., which exempts certain persons from the operation of Chapter 336. Respondents filed a counterclaim for a judicial declaration whether the activities complained of and the fitting of contact lenses and the acts related thereto constitute the practice of optometry; whether the Missouri State Medical Association has the right under Chapter 352 RSMo to promote the skill of its members by the use of ancillary lay medical workers such as respondents; whether respondents have the right under the statutes to work under the supervision of ophthalmologists and optometrists as ancillary lay medical workers and whether ophthalmologists and optometrists have the right to use ancillary lay medical workers such as opticians in the practice of their professions. On motion of respondents, over the objection of relators, the circuit court ordered Missouri State Medical Association to be made a party defendant "for the granting of complete relief and the determination of the counterclaim." The association filed an answer alleging that the prescription of contact lenses involves a medical judgment and a pathological diag-

nosis which constitutes the practice of medicine and prayed not only for the same relief sought by respondents but also for a permanent injunction enjoining all persons licensed by the Missouri State Board of Optometry from diagnosing and prescribing contact lenses.

Following a 3-week trial the circuit court made written findings of fact and conclusions of law, adjudging the issues on the information in favor of respondents Curteman and against the State and relators, and on the counterclaims for the State and relators and against respondents and the medical association. Prior to and throughout the trial the State and relators objected continuously to the presence and participation of the medical association as a party defendant. This objection, preserved in the motion for new trial filed by the State and relators and carried forward in their brief on appeal, will receive first attention.

■ We have concluded that the court erred in allowing the medical association to be joined as a party defendant in this quo warranto proceeding for the reason that it is not a real party in interest.[1]

The association, incorporated under Chapter 352, V.A.M.S., is a private organization created for the promotion of the interests of its members, who are some but not all of the medical doctors of the state. The association has no official status and no private rights or interests *as an association* which could or might be affected by this proceeding. The association's professed interest in securing a judicial declaration of what constitutes the practice of optometry, whether lay medical workers may assist ophthalmologists, and whether

licensed optometrists should be enjoined from prescribing contact lenses for the human eye, is an interest shared by the public at large. Whereas an ophthalmologist might have a special interest in obtaining such a judicial declaration, the association as such does not have a special interest because it does not practice medicine, ophthalmology or optometry or perform the work of an optician or lay medical assistant. "It stands on the same footing as a private individual who desires to see the law enforced, but without any private rights or interests which are affected in any way by the alleged conduct of the respondent[s]." State ex inf., Wallach ex rel. Missouri Optometric Ass'n v. Schneider's Credit Jewelers, Mo.App., 243 S.W.2d 125, 128 [5]. "No matter how solicitous the [association] may be of the rights of its members it cannot by reason of its design or desire to help them sue in its own name to enforce their rights." Missouri Veterinary Medical Ass'n v. Glisan, Mo. App., 230 S.W.2d 169, 172 [3]. The association is not a party in interest and its answer and counterclaim disclose no " 'legally protectible interest at stake.' " Stribling v. Jolley, 241 Mo.App. 1123, 253 S.W.2d 519. Accordingly, Missouri State Medical Association is ordered dropped as a party defendant, and in the determination of this appeal its pleadings will be disregarded. The appearance of the association at the trial and in this Court, however, is approved and will be taken into consideration as if the association had requested and been granted leave to appear as amicus curiae, and its brief and argument on the issues raised between relators and respondents Curteman will be considered as the brief and argument of an amicus curiae.

---

1. "Every action shall be prosecuted in the name of the real party in interest, * *." Supreme Court Rule 52.01, V.A.M.R.; § 507.010, RSMo 1959, V.A.M.S. (In view of our ruling it is not necessary to consider the otherwise pertinent question whether in quo warranto to oust a corporation of some power which allegedly it is unlawfully exercising the only proper party defendant is the corporation, see State ex inf. McKittrick, ex rel. City of California v. Missouri Utilities Co., 339 Mo. 385, 96 S.W.2d 607, 613 [4], 106 A.L.R. 1169; State on Inf. of Wear v. Business Men's Athletic Club, 178 Mo. App. 548, 163 S.W. 901, 907 [3], and whether others are not proper parties to such a special proceeding. See 74 C.J.S. Quo Warranto §§ 32b and 33.)

The principal question for decision is whether the activities and practices of respondents Curteman constitute the unlawful practice of optometry. This involves the construction of § 336.010, V.A.M.S., in particular:

"336.010. Defining practice of optometry

"Any one of any combination of the following practices constitutes the practice of optometry:

"(1) The examination of the human eye, without the use of drugs, medicines or surgery, to ascertain the presence of defects or abnormal conditions which can be corrected by the use of lenses, prisms or ocular exercises.

"(2) The employment of objective or subjective mechanical means to determine the accommodative or refractive states of the human eye or the range of power of vision of the human eye.

"(3) The prescription or adaptation without the use of drugs, medicines or surgery, of lenses, prisms, or ocular exercises to correct defects or abnormal conditions of the human eye or to adjust the human eye to the conditions of special occupation. No registered apprentice may independently practice optometry. A registered apprentice may, however, under the immediate personal supervision of a registered optometrist, assist a registered optometrist in the practice of optometry."

▮ Preliminarily we consider whether the word "lenses" occurring in subsections (1) and (3) above includes contact lenses, or refers only to ordinary spectacle lenses. Respondents contend that in enacting § 336.010 in the year 1921 the General Assembly did not intend to grant to optometrists the authority to prescribe and fit *contact* lenses; that under accepted rules of statutory construction it may not be said that the legislators intended that the word "lenses" as used in § 336.010 include contact lenses because contact lenses "as they are known and used today" were un-known in 1921. "Lenses" as used in the statute is a generic term, the dictionary definitions of which are and in 1921 were broad enough to include contact lenses. While the current much-improved contact lens had not been developed in 1921 the evidence shows that contact lenses were first used on a patient in the 1880's; that scleral contact lenses were invented in 1888; that contact lenses had been in use for 30 or 40 years before 1937 and that contact lenses were being fitted in Missouri in 1919. It may not be assumed that the General Assembly was ignorant of their existence when it acted in 1921. On the contrary we are of the opinion that in using the general, all-inclusive term "lenses" it was intended to grant authority to optometrists to prescribe and fit contact lenses. The trial court concluded that "Contact lenses are lenses within the meaning of Section 336.010, R.S.Mo. 1959" and we reach that same conclusion of law.

The twenty-one findings of fact made by the trial court are supported by substantial evidence and we make the same fact findings on this review, except that part of Finding of Fact No. 13 that "The technician performs the physical work of preparing the lens for the patient from raw or unfinished lenses." In this case that work is performed by Ocular Laboratory (except that Curteman makes minor modifications in the lenses as needed to reach a proper fit after they are received from fabricator Ocular Laboratory).

The following condensation of the evidence contained in the 2,216 page transcript, in the preparation of which we have drawn liberally upon the trial court's findings of fact without using quotation marks, will suffice for an understanding of the issues here for decision:

Dale Curteman, Inc. is a business corporation organized under Missouri laws, with its principal place of business located at 231 West 47th Street, Kansas City, Missouri. Respondent Dale Curteman is president of the corporation, owner of all of the stock except qualifying shares, and has

over-all charge of the corporation. Dale Curteman, his wife, his brother Darwin, and his sister-in-law are the officers and constitute the board of directors of the corporation. Dale Curteman had no formal education beyond high school and has never attended a school of medicine or optometry. No officer, director or employee of the corporation is a registered physician or optometrist; all are laymen; no physician or optometrist is ever present at the corporation's place of business. Neither Dale Curteman nor any Curteman employee holds himself out as a physician or ophthalmologist or proposes to make medical judgments or diagnoses, nor does he hold himself out as an optometrist. The business of the corporation is the fitting, upon referral from medical doctors, of artificial eyes, contact lenses, prosthetic appliances, fingers, noses and ears. It advertises in the telephone directory under the classification "Artificial Eyes, Human," as "Creator of Artificial Eyes, Made to Order and Filled from Stock. Dealing with the medical profession for 26 years." Under the classification "Contact Lenses" the corporation advertises its name and address and "Pre-Corneal Custom Curved Contact Lenses." Under the caption "Optical Goods, Retail" the corporation advertises its name and address and "Creator of Artificial Eyes, Custom Curved Contact Lenses, Prosthetic Appliances." Neither the respondents nor the employees of the corporation manufacture, sell or deal in conventional eyeglasses or spectacles. Dale Curteman annually applies to the city for an occupational license as an optical goods manufacturer. Curteman obtains contact lenses, custommade for each patient, from Ocular Laboratory, operated by David C. Hurt (Dale Curteman's father-in-law), at a cost of $30 per pair. Ocular Laboratory custom fabricates each contact lens to the specifications of the Curteman corporation, based upon prescriptions prepared by Curteman. Ocular Laboratory rents space from the Curteman corporation. The Curteman corporation charges a patient $150 for a pair of contact lenses, plus extra amounts for solution, case, and replacement service. Many ophthalmologists in the Kansas City area send their prescriptions to Curteman to be converted into contact lenses by Curteman and by Curteman fitted to the eyes of their patients. The corporation's gross receipts for the year 1967 were $121,-893; for the year 1968, $189,717.

Respondents' *modus operandi* is as follows: If a candidate for contact lenses comes directly to Curteman he or she is directed to an ophthalmologist for an eye examination and a prescription for conventional spectacles or eyeglasses, if it is determined that the patient is a proper person for contact lenses. The ophthalmologist examines the patient, determines whether he or she is physically competent and emotionally ready for contact lenses, refracts the patient's eyes, prescribes the necessary correction (for conventional eyeglasses), and sends or telephones that prescription to Curteman. A prescription for conventional spectacles is not a prescription for contact lenses. The information contained in a prescription for conventional spectacles (power of the sphere, cylinder, axis) is not a sufficient basis upon which to fabricate a contact lens. First it is necessary for Curteman or his employees to convert the ophthalmologist's spectacle lens prescription to a power to be incorporated into contact lenses. The power thus derived by Curteman from the ophthalmologist's prescription constitutes one of eleven factors or specifications included in a prescription form prepared by Curteman and delivered to Ocular Laboratory for actual fabrication of the contact lenses. That prescription form, delivered to Ocular Laboratory, contains the following information and specifications: (1) the keratometer reading, which shows the curvature of the cornea; (2) the spectacle refraction (from the ophthalmologist); (3) the vertex distance; (4) the corneal diameter; (5) the base curve; (6) the power allowance for vertex distance; (7) the finished diameter of the lens; (8) the secondary curves; (9) the optic diameter; (10) the thickness of the lens; (11) the tint (color)

of the lens. Of these specifications only (2) is supplied directly by the ophthalmologist. The other ten are developed and supplied by Curteman. In the process of obtaining and fitting contact lenses to the human eye Curteman and its employees use the following instruments, devices and substances: (a) keratometer; (b) biomicroscope ("slit lamp"); (c) lensometer; (d) fluorescein dye strips; (e) radiuscope; (f) Burton light; (g) topogometer; (h) cutdown lathe; (i) Vego lathe; (j) base curve measuring device; (k) lens diameter gauges; (l) thickness gauges, (m) magnifiers and (n) various manufacturers' charts. On the first appearance of the patient at Curteman's place of business Curteman (by "Curteman" we refer to Dale, Darwin, Mr. Burgess, or other employees fitting contact lenses) measures a part of the cornea of the patient by use of the keratometer and makes other measurements of the eye. An appointment is made for the patient's return to the Curteman place of business. Curteman consults a manufacturer's mathematical conversion chart and converts the ophthalmologist's prescription to a different set of numerals, of a kind and nature required by Ocular Laboratory for the fabrication of contact lenses. Curteman then decides the base curve to be incorporated in the contact lens. The base curve is the curve of the concave side of the contact lens that fits over the patient's cornea. Curteman makes these further decisions: the thickness of the lens; the corneal diameter of the lens; the vertex distance; the power allowance for vertex distance; the finished diameter of the lens; the secondary curves; the optic diameter; any third or additional curve radius required; the edge construction and thickness, and the tint. After the contact lenses, fabricated by Ocular Laboratory to meet Curteman's specifications, are returned to Curteman the latter sees the patient a second time, inserts the fabricated lenses in his eyes, instills fluorescein dye and uses a biomicroscope to examine the eyes and determine whether the lenses properly fit. Curteman then instructs the patient how to insert and remove the lenses, provides a schedule with instructions as to the time periods each day for the wearing of the lenses, and gives the patient a booklet "Your Contact Lenses" with Curteman's name and address on it. The booklet instructs the patient, among other things, to call Curteman and describe the patient's experiences in the event of any unusual or pronounced irritation; warns him not to resume wearing without contacting Curteman if for any reason lenses are removed for more than 24 hours; advises him to follow the wearing schedule faithfully, and to report to the "technician"; tells patients to feel free to call Curteman's office if they have problems, and gives other advice calculated to aid Curteman's "study, observation and evaluation." The booklet further advises the patient to have a re-examination every six months by Curteman, "for which there will be a charge." At the designated time the patient returns to Curteman and a consultation is had in which Curteman examines the eyes with a biomicroscope to determine whether there are any scratches or punctate wounds or damage of any kind that the lenses may have caused. The patient is asked by Curteman how the lenses are feeling; whether the patient is experiencing any burning sensation, fogging or slipping, and as to his vision with the lenses. If Curteman finds or suspects any untoward condition the patient is referred to the doctor. If minor modifications of the lenses are needed Curteman may make such adjustments, for instance, putting a secondary bevel on the periphery of the lens. The patient's record is marked as to each of these matters. Eliciting and evaluating the patient's responses as to his experience with the lenses is important to enable the person fitting the lenses to make observations as to the cause of any symptoms and decide whether to advise the patient to discontinue wearing the lenses, alter the wearing schedule, modify the lenses or prepare new lenses. The "adaptive period" during which the patient is accommodating to the wearing of contact lenses is the "most critical period" throughout the wear-

er's lifetime. After Curteman determines that the patient has been properly fitted (which may require more than two trips to Curteman's establishment) the patient is directed to return to the ophthalmologist, who examines the eyes and the lenses for final approval or further modification. The ophthalmologist may direct Curteman to have the patient return to him for evaluation and study during the fitting process, and may instruct Curteman before, during and after the services rendered.

The ophthalmologists exercise a personal and professional judgment as to the proficiency, skill and reliability of Curteman as a technician in deciding to send their patients and prescriptions to Curteman. The ophthalmologists approve the use by Curteman of the various instruments at Curteman's establishment, the fluorescein dye, the tables and charts, the placing of the lenses on the eyes of the patient, the issuance of the wearing schedules, and all other operations of Curteman above described. Curteman is subject to the orders and directions of the ophthalmologists at all times. If the ophthalmologists have additional instructions or need further assistance at any time they call upon Curteman for further services. Curteman's work in fitting contact lenses has continued over a number of years, during which the ophthalmologists and Curteman have standardized certain procedures, and established various routine steps and acts to be performed by Curteman, thus minimizing the amount of personal direct supervision the ophthalmologist has to give Curteman's work. For instance, Dr. S directs Curteman that if the doctor makes no different notation with respect to vertex distance, Curteman is to use the standard vertex distance shown on a chart—13 millimeters.

At the instance of the state board of optometry two persons went to Curteman for contact lenses. Curteman directed both of them to Dr. S, an ophthalmologist, and in the course of the fitting of these two persons with contact lenses the various activities and practices of the ophthalmologist,

Curteman and Ocular Laboratory described in the above *modus operandi* took place.

■ On these facts we hold that the activities and practices in which Curteman engages, and which Curteman performed for the two investigators sent to Curteman by the state board of optometry, constitute the prescription *and* adaptation of lenses to correct defects or abnormal conditions of the human eye, and thus constitute the practice of optometry within the meaning of the language of subsection (3) of § 336.010 of the statutes defining optometry. This conclusion is dictated from the necessary construction of the language of §§ 336.010, 336.120 and 336.190 and Chapter 336 considered in its entirety; from the dictionary and testimonial definitions of the critical language of § 336.010; from a decision of this Court in 1963 under similar facts, and from the persuasion of the better considered cases from foreign jurisdictions under similar statutes and cognate factual situations.

### I. "Prescription" of lenses

That Curteman engaged and engages in "[t]he prescription * * * of lenses * * to correct defects and abnormal conditions of the human eye" is clear under all accepted definitions of the term "prescription." To "prescribe" means "to write or give medical prescriptions (for a patient) * * to give advice in the manner of a doctor giving a medical prescription * * * to lay down authoritatively as a guide, direction, or rule of action: impose as a peremptory order: dictate, direct, ordain * * * to direct, designate, or order the use of as a remedy (the doctor *prescribed* quinine)." Webster's New International Dictionary, Third Edition. A prescription for a contact lens is a written direction for the preparation of such a lens to be fabricated in conformance with certain specifications calculated to meet the refractive needs of the human eye, and includes both the device and the instructions given by the prescriber as to the use of the device. Without doubt the form which Curteman prepares, issues

and presents to the laboratory for fabrication of contact lenses is a *prescription* within the wording of subsection (3). One basic factor contained in the prescription (the correction of the refractive error) is derived from a prescription issued by an ophthalmologist, but it is not possible to fabricate a contact lens from a prescription for ordinary spectacles. Ten other additional operations, measurements, judgments and decisions must necessarily be made by someone before the "converted" prescription may be issued in form sufficient to enable a laboratory worker to fabricate the lens. Curteman performs these ten additional necessary operations, measurements, etc., determines and prescribes the final specifications, and issues the prescription used by the fabricator. Thereafter Curteman instructs the patient as to the use of the devices. Under the wording of subsection (3) as written, the only reasonable and realistic conclusion is that Curteman is engaging in the prescription of lenses to correct defects or abnormal conditions of the human eye.

It does not militate against this conclusion that one ingredient of the final prescription comes from a physician or that after Curteman performs these services to the best of Curteman's ability the result is subject to review and approval or disapproval by the physician, who inspects the lenses and re-examines the eyes of the patient. "It is no defense that Reiss processed a doctor's prescription and that his work had been pronounced satisfactory by the ophthalmologist after a wearing time of three weeks. The crucial period requiring professional supervision was at the time of the adaptation of the lenses, their initial adjustments and the early stages of wearing." New Jersey State Board of Optometrists v. Reiss, (1963) 83 N.J.Super. 47, 198 A.2d 816, 1. c. 822. "Appellant's contention that he would have referred the patient back to the prescribing doctor does not excuse his practice of optometry at the time of fitting." Fields v. District of Columbia, (1967) D.C.Ct.App., 232 A.2d 300, 1. c. 306

Nor is Curteman exempted from the operation of Chapter 336 on Optometrists under § 336.120, V.A.M.S., exempting "Physicians or surgeons of any school lawfully entitled to practice in this state." This exemption is granted to *physicians and surgeons* and does not in terms or by necessary implication extend to lay technicians. In this connection it is significant that our statutes make provision for one and only one classification of persons authorized to assist those empowered by § 336.010 to prescribe or adapt lenses for the human eye, namely, registered apprentices assisting registered optometrists. Chapter 336 on Optometrists recognizes such apprentices and authorizes them to assist registered optometrists in the practice of optometry, *provided they have a certificate of registration as an apprentice and work "under the immediate personal supervision of a registered optometrist."* § 336.010. No corresponding statute recognizes lay technicians, provides for their licensure or authorizes such assistants to work under the immediate personal supervision of licensed physicians practicing ophthalmology. This court may not by judicial fiat create such a class, prescribe their qualifications, provide for their licensure and authorize them to perform this function. Nor have physicians or optometrists been authorized by statute, in the practice of their professions, to utilize the services of unlicensed and unregistered lay technicians in the performance of acts constituting the practice of optometry (no matter how convenient and satisfactory such an arrangement may be to the physician or optometrist, and no matter how adequately such a system may serve the public need). Nor do Curteman's activities and practices fall within the exemption on the theory that Curteman is but the alter ego or extension of the hands and fingers of the ophthalmologist. Pointing to the invaluable services rendered by other trained technicians and allied health personnel (laboratory and X-ray technicians, nurses, physiotherapists, etc.) as assistants to physicians and surgeons, respondents claim that as trained technicians

working as subordinate assistants under the supervision, direction and control of ophthalmologists they are capable of performing and should be permitted to perform the routine, mechanical tasks involved in filling prescriptions of ophthalmologists and fitting contact lenses for their patients; and that the use by ophthalmologists of such technicians' services should be recognized as lawful. This argument overlooks the fact, which we find from contested evidence, that the activities and practices of Curteman do not involve mere routine, mechanical acts; that the several decisions and judgments which necessarily must be made in preparing a contact lens prescription and in fitting contact lenses require a considerable degree of professional skill and judgment. State ex rel. Reed v. Kuzirian, (1961), 228 Or. 619, 365 P.2d 1046, 1. c. 1047, 88 A.L.R.2d 1284; Fields v. District of Columbia, supra, 232 A.2d 1. c. 304–305. It overlooks the fact that Curteman does not *fill* the ophthalmologist's prescription. Curteman *completes, prepares and issues* the prescription from which contact lenses are fabricated by another. Furthermore, this argument ignores the conclusive fact that Chapter 336, which dictates who may practice optometry, does not accord that privilege to trained technicians or allied health personnel. In its wisdom, by the passage of Chapter 336, the General Assembly has restricted and confined the class of persons authorized to perform these acts and make these decisions to registered optometrists, registered apprentices of optometrists, and physicians and surgeons exempted from the operation of Chapter 336 by § 336.120, V.A.M.S. As we have seen that exemption does not extend to lay technicians such as Dale Curteman, the Curteman corporation or its employees, and ophthalmologists have no right to set aside statutory provisions regulating the practice of optometry, delegate their privilege to practice optometry to others, or authorize unlicensed and unregistered laymen to perform functions which constitute the practice of optometry (no matter how proficient or well trained such laymen may be).

Pennsylvania Optometric Ass'n, Inc. v. DiGiovanni, (1968) 45 Pa.D. & C.2d 245, 1. c. 269–270.

## II. "Adaptation" of lenses

It is equally plain that Curteman engaged and engages in "[t]he * * * adaptation * * * of lenses * * * to correct defects or abnormal conditions of the human eye." To "adapt" means "to make suitable or fit (as for a particular use, purpose, or situation) * * * to make suitable (for a new or different use or situation) by means of changes or modifications." Webster's New International Dictionary, Third Edition. "Adaptation" is "the act or process of adapting, fitting or modifying" or "adjustment to environmental conditions." Idem. *Adaptation is synonymous with fitting.* The adaptation of contact lenses by one prescribing such lenses is the activity or process by which such lenses are fitted to the eyes of an individual. It includes all of the actions taken by Curteman in measuring and examining the eye of the patient, the insertion of the fluorescein dye, the placing of the lenses on the cornea, the giving of a wearing schedule, the examination of the patient and the eye after trial use of the lenses, and the making of any necessary modifications in the lenses to insure a proper fit. Curteman makes contact lenses suitable to patients; fits and adjusts them to the human eye; alters, changes the form and structure and modifies contact lenses to fit the needs of the patient. Dale Curteman conceded that his corporation is engaged in adapting contact lenses, in the following exchange: "Q And would you state what business Dale Curteman, Inc. is engaged in? A The fitting, upon medical referral from medical doctors, of contact lens, artificial eyes and prosthetic appliances." Under Dale Curteman's own admission and under the plain and unambiguous language of the subsection Curteman is engaged in the adaptation of contact lenses to correct defects or abnormal conditions of the human eye.

As we construe Chapter 336 and its several provisions the circuit court clearly erred in concluding as a matter of law that the activities and practices of Curteman do not constitute the practice of optometry in violation of Chapter 336.

This construction is buttressed by the decision of this Court in 1963 in Ketring v. Sturges, Mo.Sup., 372 S.W.2d 104, that the same acts which the evidence in this case shows Curteman performed (established in Ketring by an agreed statement of facts), performed by an unlicensed layman (an optician), constitute the practice of optometry under the laws of this state, "in the absence of any statute that would authorize opticians to measure the eyeball or to insert and adjust contact lenses." 372 S.W. 2d, 1. c. 113 [6]. (As previously developed, there is no such statute authorizing opticians or lay technicians such as Curteman to perform these functions.)

We are further persuaded to this view from a consideration of the following cases from other jurisdictions:

State ex rel. Reed v. Kuzirian, (1961) 228 Or. 619, 365 P.2d 1046, 88 A.L.R.2d 1284, in which under a statute defining the practice of optometry as "the adaptation of lenses or frames for the aid (of the human eye)" the Oregon Supreme Court held that a person who inserts, fits, and adjusts contact lenses into the eye of any person is engaged in the practice of optometry within the meaning of the Oregon law.

Fields v. District of Columbia, (1967) D.C.Ct.App., 232 A.2d 300, in which under a statute including in the definition of the practice of optometry "the adaptation of lenses for the aid and relief" of visual defects, the District of Columbia Court of Appeals held that the procedures and acts of an optician (as to whom there is no licensing requirement) in the fitting of contact lenses in the manner shown to have been Curteman's method of operation constituted the adaptation of lenses within the meaning of the statute.

New Jersey State Board of Optometrists v. Reiss, (1963) 83 N.J.Super. 47, 198 A.2d 816, in which under a statute providing that a person shall be deemed to be practicing optometry "who shall employ any means for the measurement of the powers of vision *or the adaptation of lenses* or prisms *for the aid thereof,*" the Superior Court of New Jersey, Appellate Division, held that a licensed optician who performed the same acts performed by Curteman was practicing optometry without a license; that the plain wording of the statutes made it clear that "the fitting of contact lenses is within the professional scope of the optometrists but is an activity proscribed to the artisan trade of an optician or ophthalmic dispenser"; that "In violation of the letter and spirit of the law, Reiss adapted lenses to aid the vision and was engaged in the business of fitting contact lenses."

Melton v. Ezell, (1967) 250 S.C. 183, 156 S.E.2d 871, in which under a statute providing that a person shall be deemed to be practicing optometry if he shall "prescribe or fit contact lenses," in the same factual background demonstrated here, the Supreme Court of South Carolina held that the optician, rather than the referring physician, was the contact lens practitioner, and was engaged in the unlawful practice of optometry.

We have read and considered the cases cited by respondents and the amicus curiae. Instead of extending this opinion by a case-by-case analysis we conclude that these cases may be distinguished, either on the ground that the facts or statutes involved are fundamentally and vitally different, or we disagree with their reasoning and philosophy.

■ Respondents raise a constitutional point, claiming that the State and relators are attempting to enforce a construction of various sections of Chapter 336 so as to deprive respondents of their liberty and property in violation of the due process clauses of the state and federal constitutions.

Chapter 336 is a regulatory act, enacted under the police power, for the protection of the public health, "to assure high standards of professional competence." Head v. New Mexico Board of Examiners in Optometry, (1963) 374 U.S. 424, 83 S.Ct. 1759, 10 L. Ed.2d 983. Its wisdom is a matter for the General Assembly, not for the courts. Williamson v. Lee Optical of Oklahoma, Inc., (1955) 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563; Roschen v. Ward, (1929) 279 U.S. 337, 49 S.Ct. 336, 73 L.Ed. 722; Head v. New Mexico Board of Examiners in Optometry, supra. Respondents have not pointed out in what specific manner the General Assembly exercised the police power of the State in an unconstitutional manner, and we perceive none.

■ We are sensitive to the fact that in many fields of medicine physicians and surgeons customarily use the services of ancillary lay assistants and allied health personnel, without whose assistance they could not meet the public need for health services or function as effectively as they can with their assistance. We know from this record that ophthalmologists customarily delegate to lay technicians the performance of services for their patients which we have found to constitute the practice of optometry. We recognize that Dale Curteman and the Curteman employees have been in the business for years; that their proficiency in the field is recognized by outstanding physicians; that their services are said to be important as a practical matter in meeting the needs of the public, and that our holding will interfere with many existing established customs and practices. Where established customs and practices are challenged and found to run counter to plain and unambiguous language of controlling regulatory statutes such customs and practices must give way to the law, which this Court must declare as it is and not as some would prefer that it had been written. If it is desirable as a matter of public policy that capable and proficient lay technicians be authorized to practice optometry by assisting ophthalmologists and optometrists in the performance of the acts and the making of the decisions necessary to provide the public with contact lenses, that authority must come from the General Assembly and not by way of judicial legislation.

■ Accordingly, the judgment of January 13, 1970 is reversed, both on the information and counterclaim, and the cause is remanded with directions to enter a new judgment finding the issues on the information for State of Missouri and relators and against respondents; finding that the activities and practices of respondents and of the employees of the Curteman corporation (specifying same) constitute the practice of optometry without certificates of registration as optometrists, in violation of Chapter 336, V.A.M.S.; finding that the Curteman corporation has violated the franchise granted by the State and imposing a fine against the corporation under the authority of § 531.050, V.A.M.S. (which shall be nominal since no improper motives were shown, State ex inf. McKittrick v. Wymore, 345 Mo. 169, 132 S.W. 2d 979 [3, 4]) but not decreeing forfeiture of the corporate charter; enjoining respondents and the employees of the Curteman corporation from engaging in the practice of optometry in this State in the manner shown in evidence, without certification, and enjoining them from advertising the fitting of contact lenses, as prayed for in the information; finding the issues on respondents' counterclaim for State of Missouri and relators and against respondents; declaring that neither respondents nor the employees of the Curteman corporation have any right to engage in the activities and practices or to perform the services for patients referred to them by physicians and optometrists, as shown by the evidence (specifying same); declaring that certified optometrists have the right to prescribe and adapt contact lenses to the human eye; and assessing the costs against respondents.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the Court.

MORGAN, P. J., HENLEY and DON- NELLY, JJ., and CONLEY, Special Judge, concur.