## Neill v. Wall and Ochs, Inc.

*Samuel M. Lehrer,* for *Ettinger, Poserina, Silverman, Dubin, Anapol & Sagot,* for plaintiffs.

*Walter R. Milbourne,* for *Obermayer, Rebmann, Maxwell & Hippel,* for defendant Wall & Ochs, Inc.

*Harry J. J. Bellwoar, III,* for *Bellwoar, Rich & Mankas,* for defendant, J. E. Limeburner Co.

*Marjorie G. Marinoff,* for *Pepper, Hamilton & Scheetz,* for Philadelphia County Medical Society as amicus curiae.

EISEMAN, J., October 12, 1973.—This matter comes before the court as two actions in equity, consolidated for purposes of trial, wherein the plaintiffs, two licensed optometrists, and the Pennsylvania Optometric Association, seek to enjoin the defendants, two corporations engaged in business as opticians, from fitting contact lenses, alleging that they are practicing optometry without a license contrary to the laws[1] of this Commonwealth.

---

[1] Act of March 30, 1917, P. L. 21, sec. 1, as amended August 17, 1951, P. L. 1280, 63 PS §231.

Defendants, in answer to the aforesaid allegation, affirm that they do fit contact lenses, but deny that said fitting constitutes the practice of optometry under the statute. Moreover, defendants further allege that they act in a capacity ancillary to a physician, thus falling within section 5 of the statute which exempts physicians and surgeons.

Further, defendants in new matter allege (a) that the fitting of contact lenses requires medical judgments which optometrists cannot make, and therefore plaintiffs, not licensed as physicians in the field of medicine, should be enjoined from fitting contact lenses; (b) defendants assert the equitable doctrines of laches and unclean hands as a bar to plaintiffs' action; (c) defendants question the constitutionality of the Pennsylvania Optometric Act under both the Federal and State Constitutions; and (d) relief requested by plaintiffs violates anti-trust law of the United States.

## PARTIES

1. Dr. John C. Neill, Dr. Harry Kaplan, optometrists, and members of the Pennsylvania Optometric Association, and the Pennsylvania Optometric Association, are the plaintiffs in the proceeding.

2. Wall and Ochs, Inc. and J. E. Limeburner Company are the defendants in the proceeding.

3. The Philadelphia County Medical Society, while not a party to the proceeding, was accorded the opportunity to file a brief as amicus curiae.

## LEGAL ISSUES

1. Do the acts performed by defendants in fitting contact lenses constitute the practice of optometry?

2. Do defendants act as "ancillary to the physician" and thereby become exempt from the operation of the

optometry statute by virtue of section 5 which exempts physicians and surgeons?

3. Are plaintiffs barred by the equitable doctrine of laches and unclean hands?

4. Is the Pennsylvania Optometric Act violative of either the Federal or State Constitutions?

5. Is plaintiffs' requested relief violative of the antitrust laws of the United States?

## FINDINGS OF FACT

1. Plaintiff John C. Neill is a licensed optometrist and a member of the Pennsylvania Optometric Association who has engaged in the practice of fitting contact lenses and who has been intimately involved as a practitioner, educator and author in the field of contact lenses for several decades.

2. Plaintiff Harry Kaplan is a licensed optometrist and a member of Pennsylvania Optometric Association, who has engaged in the practice of optometry since 1949, and is a respected practitioner in the field of contact lens fitting.

3. The Pennsylvania Optometric Association, Inc., is a non-profit corporation with its principal office at 218 North Street, Harrisburg, Pa., and consists of individual optometrists who are engaged in the practice of optometry pursuant to statute. Presently there are 147 optometrists in the Philadelphia area who are members of the Pennsylvania Optometric Association, 42 of whom having been admitted to membership from 1968 to date.

4. Defendant corporation J. E. Limeburner is a business corporation organized under the laws of Pennsylvania, with its principal place of business at 1923 Chestnut Street, Philadelphia, Pa.

5. Defendant corporation Wall and Ochs, Inc. is a business corporation organized under the laws of

Pennsylvania with its principal place of business at 1902 Chestnut St., Philadelphia, Pa.

6. Neither corporate defendant, nor any of its agents, servants or employes, is licensed as an optometrist under the Act of March 30, 1917, P. L. 21, as amended, nor as a physician or surgeon under the Act of June 3, 1911, P. L. 139, as amended.

7. Both defendants, through their agents, servants or employes, are engaged in business as opticians, which has generally been regarded as a skill or craft of artisans.

8. Each of the defendants, through his agents, servants or employes, renders a service of fitting contact lenses on prescriptions from ophthalmologists, which prescriptions indicate that the customer is suitable for contact lenses. The individual employes of defendants performing the fitting are customarily called "contact lens technicians."

9. Defendant Wall and Ochs, Inc. employs one Barclay Hargreaves, a supervisor who oversees the contact lens department and its employes at its various stores in and around the Philadelphia area. This individual received no formal training in the fitting of contact lenses, nor in the histology or pathology of the eye. Rather, he completed a two-week program in fitting contact lenses given by an optical manufacturing company.

10. Defendant J. E. Limeburner Company, Inc. presently employs one contact lens technician, Eleanor Mammorella, who performs contact lens fitting at stores in Philadelphia and its surrounding communities. She received no formal instruction in fitting contact lenses, histology or pathology of the eye. Rather, she studied under a registered nurse who had been employed by defendant. However, at the time

of this litigation, Mrs. Mammorella was not a registered nurse herself. In addition to studying under a registered nurse, she occasionally attended seminars in contact lens fitting given by optical equipment manufacturers.

11. Plaintiffs, as licensed optometrists in Pennsylvania, must pass an examination given by the State Board of Optometry, which includes practical, theoretical and physiological optics, theoretical and practical optometry, anatomy, physiology and pathology as applied to the eye. Moreover, in order to qualify to take said examination, an applicant must meet the following minimum educational requirements:

A. A preliminary education equivalent to a four-year high school course which is approved by the Department of Public Instruction.

B. Graduation from an accredited school of optometry which is approved by the Department of Public Instruction and whose curriculum includes three years of formal training in the aforementioned and allied subjects.

12. The fitting procedure for contact lenses by defendants' employes includes the following:

(a) Defendants receive a prescription from an ophthalmologist, which includes the refractive power of a spectacle lens and some type of statement indicating that the individual is suitable for contact lenses. Further, in most cases, the prescription includes the vertex distance.[2]

(b) The cornea[3] is then measured with the use of a keratometer.[4]

---

[2] The vertex distance is the distance from the outermost surface of the cornea to the correcting lens, the back surface of the lens.

[3] The transparent part of the coat of the eyeball which covers the iris and the pupil and admits light to the interior: Webster's New International Dictionary, 3d ed.

[4] A keratometer is an instrument used to measure the radius

(c) Based upon the keratometer reading, and the fitter's observations as to the size of the opening between the eyelids, the size of the iris and the size of the pupil, a trial lens is selected from a set of approximately 2000 trial lenses.

(d) When the trial lens has been selected, the fitter places it on the eye of the patient in order to evaluate the fit. Then fluorescein[5] is put into the eye to determine if proper tear flow exists under the lens. This is a judgment determination.

(e) The patient normally wears this initial trial lens for approximately one hour, during which time the fitter elicits subjective reactions from him to more fully evaluate the fit of the lens. This is a judgment evaluation.

(f) When the fitter is satisfied the trial lens fits properly, based on all the aforesaid observations and reactions gleaned from the patient, the contact lens is ordered from a manufacturer. The order blank sent to the manufacturer includes the initial spectacle refractive power prescription made by the ophthalmologist as to the contact lens power. In addition to the contact lens power, the order also contains six additional measurements[6] and specifications all of which are determined by the optician.

(g) Upon receipt of the ordered lenses from the manufacturer, the fitter checks them to determine

---

of curvature of the cornea by means of light reflected from the surface of the cornea which is then translated into diapters of curvature and read from dials on the machine.

[5] Fluorescein is an analine dye put into the eye to determine if proper tear flow exists under the lens. Fluorescein mixes with the tears and is then observed under fluorescent light and a Burton lamp to observe and evaluate tear action which must be maintained if corneal integrity is to be preserved. Should the fit be improper, stipling, edemas and abrasions may result.

[6] Keratometer reading, base curve, corneal diameter, peripheral curve, cords of optical zone, thickness of the lens (N. T. 311).

whether they conform to the order. If so, the patient is instructed to return to the office for a second visit, at which time the fitter inserts them in the eyes to observe the fit. He will again employ fluorescein and/or a Burton lamp to observe more closely the fit of the lens. He also observes the customer's reactions to the fit, which include tearing and blinking and any other subjective reactions of the patient, thus exercising judgment as to fit.

(h) During the second visit, the patient is instructed in proper hygiene concerning the use of the lens and insertion and removal of the lens. Moreover, the patient is advised as to the wearing schedule to be followed in building up his wearing time. The wearing schedule differs between fitters and patients but the over-all final objective is to have the patient wearing each lens approximately six to eight hours per day.

(i) The patient returns a third time to the fitter who again evaluates the fit of the lens with the aid of fluorescein and/or a Burton lamp, coupled with his subjective observations and the complaints of the patient. If the fit appears to be satisfactory, the patient is *advised* to return to the physician who will further evaluate the fit of the lens.

(j) When a patient has been advised to return to the ophthalmologist, he is then instructed to return to defendant, not the physician, after six months for a further check-up and cleaning and polishing of the lenses.

13. Specifically, defendants in fitting contact lenses must perform the following acts to determine a proper fit of the lens:

(a) Use a keratometer to measure the curvature of the cornea.

(b) Place a trial lens on the surface of the eye.

(c) Insert fluorescein dye in the eye to evaluate tear flow.

(d) Observe the position of the lens on the eye.

(e) Analyze the fit with a Burton lamp.

(f) Elicit subjective reactions from the wearer to further evaluate the fit of the lens.

(g) Instruct the patient in proper techniques for insertion and removal.

(h) Instruct the patient in developing a wearing schedule.

14. In order to fit contact lenses defendants must exercise judgment in determining the following measurements and specifications:

(a) The radii of curvature of the optical, peripheral and transitional zones of the contact lenses.

(b) The diameters of the contact lenses.

(c) The diameters or cords of the optical zones of the contact lenses.

(d) The thickness of the contact lens.

(e) The type of edge finish of the contact lens.

(f) Tint of the lens.

15. There is no minimum standard of education, training or competence required for opticians in Pennsylvania. Defendants have no announced policy as to a minimum standard of education or training for employes in the contact lens department.

16. When an ophthalmologist refers a patient to either defendant for contact lenses, he refers them to the defendant corporate entities, and not a particular technician employed by defendants.

17. Certain medical contraindications exist which preclude the safe use of contact lenses, including severe allergies, glaucoma, retinal detachment, among others.

18. Ophthalmologists are medically trained to diag-

nose and treat these medical contraindications. An optometrist is trained to recognize these contraindications and upon noticing same as a result of his examination, he will refer the patient to an ophthalmologist for treatment.

19. Defendants' agents, servants or employes attempt to evaluate the patients' motivation for contact lenses, in spite of the fact that the ophthalmologist has approved them for contact lenses.

20. The ophthalmologist who performed a complete ophthalmological examination and determined that the patient was suitable for contact lenses, charges approximately $25 for his services.

21. Defendants charge $175 for their services, which include the lenses, fitting of the lenses, a case in which to store the lenses, wetting and soaking solutions and any and all visits.

22. Neither defendant has an ophthalmologist or optometrist located on the premises.

23. In the majority of cases, the patient is not instructed to return to the ophthalmologist until the final lens has been fitted on the eye, and wearing time is built up to approximately eight hours. This procedure normally takes anywhere from three to eight weeks.

24. Defendants use judgment and discretion in fitting contact lenses.

25. The court accepts and adopts the definition of the terms, ophthalmologist, ophthalmology, optometry, optometrist, optician and oculist as defined[7] in Webster's Third New International Dictionary.

[7] Ophthalmologist: a physician that specializes in the study and treatment of defects and diseases of the eye.

Ophthalmology: a branch of medical science concerned with the structure, function and diseases of the eye.

Optometrist: a specialist in optometry, refractionist.

Optometry: (1) Measurement of visual powers (as by use of an

## DISCUSSION

## 1. HISTORY OF CONTACT LENSES

In order properly to understand the subject matter of this case, the court deems it appropriate to discuss briefly the history of contact lenses.

The history of contact lenses dates back to the time of Leonardo DaVinci, who conceived of a frontal refracting system. Since that time, there have been many ideas as to how to place a lens directly upon the eye. However, it was not until 1948, when Kevin Touhy invented the corneal contact lens, that the idea of a lens fitting directly on the eye was to gain widespread popularity. Rather than covering the entire sclera, as the older lenses did, the new corneal contact lens fit only over the cornea, an improvement which provided increased comfort for the user. Thereafter, in 1956, the contour corneal lens was invented. It contained two graduated curves rather than a single posterior curve and resulted in fewer abrasions and additional comfort for the wearer. These two latter developments vastly expanded the market for contact lenses. Additional developments and improvements accelerated its public and medical acceptance for both aesthetic and eye health purposes.

## 2. JURISDICTION

A court of equity has jurisdiction under our law to enjoin the unlicensed practice of a profession, despite the fact that criminal sanctions may be invoked for

optometer); (2) An occupation consisting of examination of the eye for defects and faults of refraction and the prescription of correctional lenses and exercises but not including the use of drugs or surgery.

Optician: (a) A maker or dealer in optical items and instruments; (b) One that grinds spectacle lenses to prescription and dispenses spectacles.

Oculist: (1) Ophthalmologist; (2) Optometrist.

440

such transgressions. As our Supreme Court stated in the leading case of Boggs v. Werner, 372 Pa. 312, 317 (1953):

"[T]here is ample precedent for the chancellor's conclusion that the illegal practice of a profession is a proper subject of equitable jurisdiction. We have sustained the actions of chancellors imposing restraint on illegal practice of: (a) law—Childs v. Smelter, 315 Pa. 9, 171 A. 833 and Shortz v. Farrell, 327 Pa. 81, 193 A. 20; (b) optometry—Neill v. Gimbel Brothers, Inc., 330 Pa. 213, 199 A. 178; and (c) medicine—Palmer v. O'Hara, Secretary of Welfare, 359 Pa. 213, 58 A. 2d 574."

Accordingly, the Court has jurisdiction of the proceedings.

3. DO THE ACTS PERFORMED BY THE DEFENDANTS IN FITTING CONTACT LENSES CONSTITUTE THE PRACTICE OF OPTOMETRY?

The law of this Commonwealth defines Optometry as the following:

"The practice of optometry is hereby defined to be the employment of *any means* or methods, other than the use of drugs or surgery, for the *examination of the human eye and the analysis of ocular functions, or the prescribing, providing, furnishing, adapting or employing* any or all kinds and *types of lenses* and *prisms, visual* training orthoptics, ocular exercises, and any and all preventive and corrective methods for the *aid, correction or relief of the human eye*, its associated structures, appendages and functions, other than the use of drugs or surgery.": Act of March 30, 1917, P. L. 21, sec. 1, as amended, 63 PS §231. (Italics supplied.)

The court now turns to the crucial issue to be determined: whether the acts required to formulate a

contact lens prescription constitute the practice of optometry. More specifically, do any of the aforementioned acts constitute (1) the employment of *any means* for the *examination of the human eye* and the analysis of ocular function or (2) the *prescribing, providing, furnishing, adapting or employing any or all kinds or types of lenses for the aid, correction and relief of the human eye?*

The court takes this opportunity to note the fundamental distinction between the optometrist and the optician. The former possesses the skill, education, training and competence to make sophisticated professional judgments and detect disease of the eye. The latter only has the training to perform mechanical skills with respect to the grinding and polishing of lenses. Our courts have noted this distinction:

"[T]here has arisen a classification or division, whereby some who make lenses confine themselves entirely to the work of making them in accordance with prescriptions given by physicians or oculists. These call themselves or are known as 'opticians'; others, who still manufacture the lenses . . . do not confine themselves to the making of lenses, but also examine the eyes for the purpose of ascertaining whether there are such defects visible as can be corrected by the application of lenses. This class has taken the name of 'optometrists', and that is the name by which they are now generally known.": Martin v. Baldy, 249 Pa. 253, 255 (1915)

A more recent decision of our Supreme Court spoke of the professional skills required for the practice of optometry:

"[O]ptometry has become a real science devoted to the measurement, accommodation, and refractory powers of the eye without the use of drugs, thus superseding obsolete and archaic methods of fitting eye-

glasses. It has become one of the important professions, and for the preparation of its proper practice, courses in optometry, physics, physiology, pathological conditions of the eye, the proper use of the retinascope, ophthalmometer, ophthalmoscope, refractor, prisms, lenses, etc. are given as part of the curriculum in many of our largest universities as well as colleges specializing in optometry. *The legislatures throughout the entire country have recognized that the proper practice of this profession is of the most vital importance to the public and have made due provisions, not only for the licensing of optometrists after proper examination, but for regulating the proper practice of the profession."*: Neill v. Gimbel Brothers, Inc., 330 Pa. 213, 218 (1938). (Italics supplied.)

In Pennsylvania Optometric Association, Inc., v. DiGiovanni, 45 D. & C. 2d 245, 258 (1968), on the same subject, the court stated:

"The optometrist, not the optician, is the one who is regarded as the professional with the skill and training necessary to perform the intricate processes involved in the treatment of defective sight. The optometrist is the one who is viewed as possessing the experience and judgment fundamental to the expert care of so delicate an organ as the human eye."

First, the court holds that defendants do employ *"any means"* as those terms are used in the optometry statute, when they engage in fitting contact lenses. Defendants use sophisticated equipment, aniline dyes, trial lenses, magnifying lamps and make a subjective analysis to determine the fit of the lens.

Moreover, the court fails to see how these acts could not be considered an *examination of the human eye and the analysis of ocular* functions. An individual is observing, measuring, studying, judging and collating various data, objective and subjective, to arrive

at a conclusion concerning a fit of a lens. This is clearly an examination of the eye. As Judge Levin, our distinguished colleague, stated in Pennsylvania Optometric v. DiGiovanni, supra, p. 262:

"There is no doubt that this general procedure entails the 'examination of the human eye and the analysis of ocular functions'. What else could it possibly be considered when one places lenses into the eyes and observes with the aid of special devices and chemicals how those lenses adapt to the contours of the eyes? Whether there is friction and resulting abrasion? Or whether tell-tale air bubbles can be found under the lenses? What else but the examination of the eye and the analysis of its functions is occurring when an optician asks his customer whether lenses are irritating the eyes?"

With respect to the second part of the statute, the court holds that defendants engage in the ". . . providing, furnishing, adapting or employing any or all kinds and types of lenses and prisms, visual training orthoptics, ocular exercises and any and all preventive or corrective measures for the aid, correction or relief of the human eye."

The record clearly shows that when defendants receive a directive from an ophthalmologist to fit a particular individual for contact lenses, defendants employ a scientific instrument to determine the curvature of the cornea. Based upon this information, he then selects a trial lens from a set of approximately 2000, in an attempt to refine the initial measurement. Thereafter, the position of the trial lens is viewed under a special lamp and fluorescein strips are applied to the eye to determine the adequacy of tear layers under the lens. In addition, subjective reactions are gleaned from the patient to further evaluate and refine the fit of the lens. After completing this procedure,

defendants are in a position to forward an order to the manufacturer containing various measurements and specifications. Each act requires professional skill and judgment.

Thereafter, upon receipt of the lenses from the manufacturer, defendants check the lenses to certify they conform to the measurements. If so, defendants instruct their customers in insertion, removal and hygiene of the lenses, in addition to a wearing schedule. Each of these acts requires professional skill and judgment.

There is no doubt that this entire procedure comes within the purview of the latter part of the statute, and is violative of the terms of the act. A host of judicial authority from this jurisdiction and others supports this court's conclusion.

Under a statute less restrictive than our own, the Supreme Court of Oregon held that a person who inserts, fits and adjusts contact lenses into the eye of any person is engaged in the practice of optometry within the meaning of their statute. In addition, the court said:

"It seems shocking to relate that much the highest percentage of prescriptions for contact lenses received by defendant left to him the major responsibility of making the initial tests to determine size as well as the actual fitting of the lenses. . . .

"Above all, however, it is clear from the evidence without any reasonable doubt, that the fitting of the lenses required some degree of professional skill and judgment.": State ex rel. Reed v. Kuzirian, 228 Oregon 619, 625, 365 P. 2d 1046, 1049 (1961).

Moreover, under a New Jersey statute providing that a person shall be deemed to be practicing optometry "who shall employ any means for the measurement of the powers of vision or the adaptation of lenses

or prisms for the aid thereof," the New Jersey Superior Court held that acts similar to the ones at issue could only be performed by an optometrist. In so holding, the court said:

"[It is clear] that the fitting of contact lenses is within the professional scope of the optometrists but is an activity proscribed to the artisan trade of an optician or ophthalmic dispenser. Defendant's conduct in examining [the client's] eyes with the aid of [scientific instruments], his amplification and supplementation of the ophthalmologist's prescription, the application of fluorescein directly to the eyeballs, and the prescribing of a wearing schedule constituted the practice of optometry without a license. In violation of the letter and spirit of the law, [defendant optician] adapted lenses to aid the vision. . . .

"There is a self-evident distinction between the mechanics of making conventional eyeglasses and their adjustment to the face, and the fabrication of contact lenses and the fitting of them directly to the eyes. The latter, unlike the former, involve a direct exposure to possible eye injury and require professional skill and judgment. The character, intensity and severity of contact lenses has general recognition . . . This matter is of grave concern to the public and demands the enforcement of protective legislation.

"It is no defense that [defendant optician] processed a doctor's prescription and that his work had been pronounced satisfactory by the ophthalmologist after a wearing time of three weeks. The crucial period requiring professional supervision was at the time of the adaptation of the lenses, their initial adjustments and the early stages of wearing . . .": New Jersey State Board of Optometrists v. Reiss, 83 N.J. Super. 47, 57-58, 198 A. 2d 816, 821-822 (1964).

In addition, the District of Columbia Court of

Appeals held that the actual fitting of contact lenses was the "adaptation" of lenses within the meaning of their optometry statute.[8] In so holding, the court stated:

". . . Without repeating the entire procedure by which appellant fitted the patient's lenses, it is clear that this involved areas of judgment and skill necessary to the adaptation of lenses within the meaning of our optometry statute. This was much more than the technical preparation or sale of a pair of spectacles or eyeglasses . . .

"In each of the steps by which the contact lenses were fitted, expertness and training were essential. The consequences of improper fitting, instructing, and follow-up observation are well documented. They include actual curvature changes of the cornea, painful abrasions and ulcerations of the cornea, infections, blindness and surgical removal of the eye. The fitting of a contact lens is the introduction of a foreign body in immediate contact with a sensitive part of the body, the cornea, which can result in serious injury. This was a consequence which well might have flowed from appellant's unsupervised fitting. Without belaboring the point, *we feel that the actual fitting of contact lenses is the adaptation of lenses within the meaning of our optometry statute . . .*": Fields v. District of Columbia, 232 A. 2d 300, 304-305 (1967). (Italics supplied.)

Further, under a statute[9] similar to ours, the Missouri Supreme Court held that opticians could not engage in the fitting of contact lenses. The court said:

"On these facts we hold that the activities and practices in which Curteman engages, and which Curteman performed for the two investigators sent to

[8] See 1961 D. C. Code, sec. 2-502.

[9] See Vernon's Ann. Mo. Stats., Chptr. 336, §336.010.

Curteman by the State Board of Optometry, constitute the prescription *and* adaptation of lenses to correct defects or abnormal conditions of the eye, and thus constitute the practice of optometry within the meaning of the language of subsection (3) of §336.010 of the statutes defining optometry. This conclusion is dictated from the necessary construction of the language of §§336.010, 336.120 and 336.190 and Chapter 336 considered in its entirety; from the dictionary and testimonial definitions of the critical language of §336.010; from a decision of this Court in 1963 under similar facts, and from the persuasion of the better considered cases from foreign jurisdictions under similar statutes and cognate factual situations."

Thus it is clear that the persuasive weight of judicial authority from this and other jurisdictions with similar or less restrictive optometry statutes, holds that an optician is practicing optometry when engaged in the fitting of contact lenses.

Accordingly, in view of the specific wording of the act and the overwhelming and persuasive judicial authority, we hold that defendants are unlawfully practicing optometry when engaged in the fitting of contact lenses.

Viewed further with reference to the eye health of a patient, we are readily made cognizant of the damage which may result from an improper fit of a contact lens induced by untrained personnel. Dr. John C. Neill testified as follows:

"Q. If the fit is not proper, or properly determined, what effect could that have on the cornea?

"A. If it fits so the tears do not flow properly, the cornea will become asphyxiated and cannot get rid of the carbon dioxide, and the cornea will develop edema and bring on symptoms of halos around lights. . . .

"Q. What other effects could happen to a cornea from improperly fitting lenses?

"A. If it is excessively loose, it can cause abrasion due to excessive movement."

Also Dr. Harry Kaplan stated that damage to the eye can result from an improperly fitted contact lens:

"Q. What harm, if any, may occur to the cornea of the eye during the course of the contact lens fitting process or arising from it?

"A. The first form of irritation is usually an edema or a swelling of the epithelian portion of the cornea. It can be seen with the Slit Lamp or Retinascope. If it is allowed to continue—

"Q. Never mind that. What other forms of harm may occur?

"A. Stippling can take place.

"Q. What is that?

"A. A breakdown of the epithelia as well as of the cornea.

"Q. What other injuries or harm may occur?

"A. If it was to continue on, it might become an abrasion and cause a lot of pain and discomfort, and cause poor vision, and the patient usually is in stress where they may not be able to work for a period."

This view is not disputed by defendants' witnesses as noted by the following typical colloquy:

"Q. You testified harm can come to the cornea arising out of the process of fitting contact lenses?

"A. It is possible.

"Q. It does occur?

"A. I am sure it does."

Accordingly, in view of persuasive testimony concerning eye damage which may result from an improperly fitted contact lens, this court deems the remedy of Injunctive Relief as necessary.

## 4. DO THE DEFENDANTS ACT AS "ANCILLARY TO THE PHYSICIAN" AND THEREBY BECOME EXEMPT FROM THE OPERATION OF THE STATUTE BY VIRTUE OF SECTION 240 WHICH EXEMPTS PHYSICIANS AND SURGEONS?

Defendants contend that the contact lens technician is "ancillary to the physician" and therefore entitled to the exemption of section 240 of the statute granted to "Physicians and Surgeons":

"The provisions of this Act shall not apply to the Physicians or Surgeons practicing under authority or license issued under the laws of this Commonwealth, for the practice of medicine or surgery, or persons selling spectacles and eyeglasses but who do not assume, directly, or indirectly, to adapt them to the eye nor either practice or profess to practice Optometry."

Defendants' argument is bottomed on the contention that they act under the "supervision and control" of the physician and therefore are ancillary thereto.

With respect to this contention, the record clearly refutes this argument. Once defendants initiate the complicated fitting process, the customer may not even see the ophthalmologist for a period of three to eight weeks. This is the crucial period which requires the judgment, skill and knowledge of trained professional personnel, and we fail to see how the ophthalmologist retains control when he doesn't see the patient.

Defendants argue that even though the patient may not see the ophthalmologist for three to eight weeks, supervision is maintained because the technicians will immediately refer the patient to the ophthalmologist upon recognizing an edema, abrasion, stipling or veiling. Of course, this argument assumes that

individuals who have never received any instruction in the anatomy, histology or pathology of the eye, and for whom no minimum standard of competence is required, can recognize these symptoms. The court believes that the legislature, in attempting to protect the eye care of the public, made no such assumption when drafting the Optometric Act or in granting the exemption. Hence, we reject this contention.

Further, defendants also refer to various situations where a physician delegates authority to individuals who are not licensed as medical doctors; for example, a nurse. On this score, it should be noted that a nurse, while not licensed to practice medicine, is licensed by the state to perform various technical functions under a physician's supervision. The legislature has not provided for licensure of opticians, and therefore any delegation of authority to an optician by a physician must await legislative remedy.

It should further be noted that section 240 only makes reference to *physicians* and *surgeons* and not to ancillary personnel. This court is bound by the clear terms of the statute and cannot pursue its spirit.[10]

Further, the court believes that the costs involved in the fitting bear significantly upon this issue. The record shows that the individual is first examined by the ophthalmologist who thereafter refers the patient to defendants for the fitting process. The medical doctor who has performed a complete ophthalmological examination and has determined that the individual is properly suited and motivated to wear contact lenses charges approximately $25 for his services.

However, defendants, who merely serve as technicians, charge a minimum of $175 for their services. In analyzing the defendants' charges, it is palpably

---

[10] Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, sec. 51, 46 PS § 551.

clear that the bulk of the costs are for the defendants' fitting services, since the cost of a new pair of lenses is only $42.50. Considering the minor costs of the fabricated lenses, it is manifest that the customer is paying approximately $130 for the defendants' so-called "technical" services. It should be noted that defendants retain the entire $175, with no portion being remitted to the ophthalmologist who, it is urged, has retained supervision and control of his patient.

Accordingly, considering the great disparity between the ophthalmologist's charges and the defendants' charges, it is apparent that, pragmatically, the customer is paying for the defendants' supervision, not the doctor's.

Finally, it is clear to this court that the proper fitting of contact lenses requires professional skill and judgment. See Fields v. District of Columbia, supra. Throughout the fitting process, the fitter is required to make delicate and precise judgments regarding an object placed directly on the eyeball. In view of the skill and competence required, the court refuses to extend the fitting function to individuals for whom no minimum standard of education, training or competence is required.

Therefore, considering all of the foregoing, the court holds that defendants are not "ancillary to the physician" and thereby are not exempt from the operation of the statute.

## 5. MEDICAL TESTIMONY.

The defense presented a number of distinguished physicians[11] who specialize in the field of ophthal-

---

[11] Dr. Wilfred E. Fry, Emeritus Professor of Clinical Ophthalmology at the University of Pennsylvania, consulting surgeon at Wills Eye Hospital, President of Eye Section of Philadelphia Medical Society.

Dr. Roger Hiatt, Chairman of Department of Ophthalmology

mology. Each physician, in a varying degree, supported the contention of defendants and the County Medical Association in that (1) the services rendered by the contact lens fitter (optician) are under the supervision and control of the ophthalmologist; (2) these services are ancillary to those of the ophthalmologist; (3) there is need for the services of these contact lens fitters.

As to the first two contentions, we have heretofore discussed these issues in detail and therefore they require no further comment.

On the subject of need for the services of the contact lens fitters (opticians), the ophthalmologist explained the shortage of physicians generally and more particularly in the field of ophthalmology. Thus, the need for ancillary personnel such as defendants' employes for the time-consuming service of fitting contact lenses. It should be noted, however, that some equally distinguished ophthalmologists[12] render the entire service, inclusive of fitting contact lenses on a personal basis.

We accept the view that there is at present a shortage of physicians in the United States and are sym-

at University of Tennessee, vice president of the American College of Ophthalmology.

Dr. Philip G. Spaeth, Professor of Ophthalmology, surgeon in the field of Ophthalmology at the University of Pennsylvania, Wills Eye Hospital and Graduate Hospital.

Dr. Arthur H. Keene, resident surgeon at Wills Eye Hospital, professor of ophthalmology at Temple University School of Medicine.

Dr. Cyril Luce, formerly associate professor of Ophthalmology at Jefferson and Temple Medical Schools, on the staff at Wills Eye Hospital and Riddle Memorial Hospital.

N. T. p. 637.

[12] Dr. Kenneth I. Michelle, Dr. Sidney Weiss, Dr. John Kennedy, Dr. Murray, Dr. Lucier and Dr. Heit.

N. T. p. 25, p. 127.

pathetic to the need for paramedics to assist the physicians.

We cannot subscribe to the view that a contact lens fitter may tinker with the human eye without at least a prescribed legal minimum of training and expertise. At present there is no legal minimum standard of education, training or expertise required for defendants' employes.

A concern for the eye health of our society compels a legal minimum standard of education, training or expertise in this class of artisans. To do less would be a compromise with conscience for the sake of expediency. To set a standard would be usurping the authority of the legislature.

## 6. NEW MATTER.

A. *Should Optometrists Be Enjoined from Fitting Contact Lenses?*

Defendants, with the Philadelphia County Medical Society submitting a brief as amicus curiae, have counterclaimed, alleging that plaintiffs should be enjoined from fitting contact lenses, as said fitting requires medical judgments which plaintiffs cannot make. Contrary to the defendants' allegation, it is the opinion of the court that under our law the plaintiffs may engage in fitting contact lenses.

Defendants contend that the proper fitting of lenses requires the diagnosis of certain medical contraindications which preclude the safe wearing of contact lenses. This is quite true. However, the plaintiffs, while not permitted to treat these contraindications, are adequately trained to recognize them and upon recognition will thereupon refer a patient with a contraindication to a physician for diagnosis and treatment.

In addition, the legislative history of the optometry

statute reveals that it was the legislature's intent to permit both optometrists and ophthalmologists to fit contact lenses. The original definition of optometry[13] stated that it was "the adaptation of lenses for the correction and aid of the vision of human beings."

Thereafter, in 1951, the legislature made two significant changes in the statute. The first amendment redefined the acts which optometrists may perform, to include: "The *examination* of the human eye and the *analysis* of ocular functions or the *prescribing, providing, furnishing, adapting* or *employing. . . .*"

The second change redefined the term "lenses" as originally used in the 1917 statute to include: *"any or all kinds and types of lenses and prisms. . . ."*

When read in conjunction with the fact that corneal contact lenses came into widespread use at or about the time of the amendments, it is clear to the court that the legislature intended to afford optometrists the right to fit contact lenses.

It should further be noted that section 240[14] providing exemptions to "Physicians or Surgeons" and persons "selling *spectacles* and *eyeglasses*" has never been amended to include those who act as contact lens technicians.

Moreover, judicial authority amply supports this court's conclusion that optometrists may fit contact lenses:

"We agree with the trial court the determination as to whether a person shall wear contact lenses . . . necessitates the prescription . . . of lenses which under the Act of Assembly may lawfully be performed only by one licensed to practice optometry, or by an ophthalmologist.": *Commonwealth v. Robert A. Crouse,* Court

---

[13] Act of March 13, 1917, P. L. 21.

[14] 63 PS §240.

of Quarter Sessions of Northampton County, April Sessions No. 129 (1965).

Also, the DiGiovanni case, supra, p. 260, held that optometrists have the right to fit contact lenses:

"Furthermore, the expert testimony at trial established to our complete satisfaction that there are recognized contraindications for contact lenses, i.e., in some instances an individual cannot comfortably and safely wear such lenses; and only a skilled *physician or optometrist* is capable of determining the existence of these warning signs against the use of contact lenses. This is clearly one reason why the act regulating optometry places the prescribing of lenses within the exclusive realm of licensed *physicians and optometrists*, and this reasoning is recognized in Crouse, supra, at pp. 3 and 5." (Italics supplied.)

Accordingly, in view of the foregoing, we hold that optometrists are permitted to prescribe and fit contact lenses, and the court hereby dismisses defendants' new matter with respect to this issue.

B. *Are the Plaintiffs Barred by the Equitable Doctrines of Laches and Unclean Hands?*

Defendants also raise the defense of laches as a bar to plaintiffs' claim, alleging they unreasonably delayed seeking any form of equitable relief resulting in prejudice to defendants. A careful review of the record shows no material prejudice to either defendant, and accordingly, plaintiffs' claim is not barred by the equitable defense of laches: Crunk v. Mid-State Theatres, Inc., 404 Pa. 22 (1961). Further, it should be noted that plaintiff in this action, Pennsylvania Optometric Association, Inc., includes within its membership neophyte optometrists who have graduated within the past year. Certainly, the doctrine of laches could not apply to this group.

Additionally, defendants raise the equitable defense of unclean hands, alleging that plaintiffs have violated the Optometric Act by referring to themselves as "Doctor" or "Eye Specialist." Again an evidentiary review shows the plaintiffs held themselves out as doctors of optometry in accord with the provisions of the Optometry Act, 63 PS §239, and therefore do not come into the court of equity with unclean hands. Thus this contention is rejected.

C. *Is Plaintiffs' Requested Relief Violative of the Anti-Trust Laws of the United States?*

With respect to defendants' antitrust allegations, the court believes the state court is not the proper forum for adjudication of the issue.

Moreover, there is no evidence in the record on the subject. Hence, the allegation is dismissed.

D. *Is the Optometric Act Violative of Either the Federal or State Constitutions?*

Finally, defendants raise a constitutional objection to the Optometric Act, alleging that its terms are so vague and indefinite that men of common intelligence must necessarily guess at its meaning, thereby constituting a violation of the 14th Amendment to the United States Constitution and Article I, section 9, of the Pennsylvania Constitution: Camp v. Board of Public Instruction, 368 U.S. 278 (1961); Connally, Commissioner v. General Construction Company, 269 U.S. 385 (1926); Chester v. Elam, 408 Pa. 350 (1962).

It is the opinion of the court that the terms of the act are not vague and indefinite but quite clear and specific. The court fails to see the vagueness in terms such as "examination," "prescribing," "providing," "furnishing," "adapting," and "any or all kinds of lenses."

Moreover, it has been held that the right of an optometrist, duly licensed, to conduct his business or practice optometry, is a property right protected by the Constitution: *Harris v. State Board of Optometrical Examiners*, 287 Pa. 531 (1926); *Neill et al. v. Gimbel Bros., Inc.*, supra. Also our courts have stated that the regulation of optometry is a lawful exercise of the police power, and thus the legislature may define and regulate the practice of optometry by prescribing reasonable qualifications to be possessed by those who desire to engage in the practice. See *Harris v. Board of Optometrical Examiners*, supra.

In view of the serious eye damage which may result from an improper fit of a contact lens and the concomitant necessity to have qualified persons perform said fitting, the court deems the optometry statute a wholly reasonable and lawful exercise of the state's police power to protect the health, safety and welfare of the people. Accordingly, the court holds that the statute does not violate either the 14th Amendment of the United States Constitution nor Article I, section 9, of the Pennsylvania Constitution.

## SUMMARY

In summary, therefore, the court, in making a determination, reviewed each legal theory presented by the respective parties, as well as the briefs of counsel and the amicus curiae. The court concludes that the record in these proceedings supports the required burden of proof of the plaintiffs. Accordingly, the request for relief shall be granted.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties.

2. This court has jurisdiction over the subject matter.

3. Plaintiffs have legal standing to bring these actions against these defendants.

4. Optometry is a profession which is governed and regulated by the Act of March 30, 1917, P. L. 21, as amended August 17, 1951, P. L. 1280, 63 PS §§231-244.

5. The practice of optometry is a vested property right which equity will protect.

6. This court has jurisdiction over the unlawful practice of optometry.

7. Defendants are engaged in a commercial business as opticians. Opticians operate as artisans who grind and polish optical lenses for contact lens purposes pursuant to prescription.

8. Opticians are not subject to any formal licensure under the laws of the Commonwealth of Pennsylvania.

9. The laws of the Commonwealth of Pennsylvania make no provision for the regulation, minimum education, training or expertise of this class of artisans.

10. The fitting of contact lenses is subject to licensure in the Commonwealth of Pennsylvania.

11. Defendants have engaged in the unlawful practice of optometry in the fitting of contact lenses pursuant to a spectacle prescription from an ophthalmologist by unlawfully performing:

(a) An examination of the human eye and an analysis of ocular functions.

(b) The providing, furnishing, adapting or employing any or all kinds of lenses for the aid, correction or relief of the human eye.

12. Defendants do not come within the purview of section 240 of the optometry statute which exempts physicians and surgeons from the operation of the act.

13. Defendants do not act in a capacity "ancillary to the physician."

14. The improper administration of care to the

human eye is a service which may endanger and cause physical damage to the individual and as such is a proper subject for regulation as a lawful exercise of the police power of the Commonwealth.

15. Plaintiffs are not guilty under the equitable doctrines of laches or unclean hands.

16. Plaintiffs' request for relief does not violate the anti-trust laws of the United States.

17. The optometry statute is not violative of either the state or Federal Constitutions.

18. The fitting of contact lenses by defendants and all acts incident thereto must be enjoined to preserve the health, safety and welfare of the public.

19. The request for damages has been withdrawn by plaintiffs; accordingly, there is no finding on this subject.

### DECREE NISI

AND NOW, this 12th day of October 1973, it is hereby decreed that defendants, their agents, servants, workmen and employes are restrained and are hereby enjoined from engaging in any manner in the examination of the human eye and the analysis of ocular functions or the prescribing, providing, furnishing, adapting or employing use of contact lenses for the purpose of aiding or correcting the vision of any person. The aforesaid prohibitions shall include, but shall not be limited to:

1. Taking medical histories of persons for use in fabricating contact lenses.

2. Measuring and/or examining the eyes of persons for the purpose of determining their adaptability to contact lenses.

3. Advising or instructing persons in the proper time and technique to be used in the wearing, insertion or removal of contact lenses and/or the proper hygiene and care of such lenses.

4. Inserting into or removing from the eye of a person, test, trial or finished contact lenses.

5. Measuring the lenses of spectacles or eyeglasses to obtain the lens prescription of contact lenses.

6. Employing any means, method or instrument to examine the eye for use in the fabrication of contact lenses.